STATE OF CONNECTICUT *v.* ADRIAN D. SANTIAGO
(SC 15431)

Callahan, C. J., and Norcott, Katz, Palmer and McDonald, Js.

Argued January 16—officially released July 14, 1998

*Jon L. Schoenhorn*, for the appellant (defendant).

*Carolyn K. Longstreth*, senior assistant state's attorney, with whom were *Mark A. Stabile*, supervisory assistant state's attorney, and, on the brief, *Mark S. Solak*, state's attorney, for the appellee (state).

*Ann M. Parrent* filed a brief for the Connecticut Civil Liberties Union Foundation as amicus curiae.

*Opinion*

NORCOTT, J. The defendant, Adrian D. Santiago, was convicted by a jury of murder in violation of General Statutes § 53a-54a (a).[1] In this appeal[2] from the judgment

---

[1] General Statutes § 53a-54a provides in relevant part: "Murder. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime. . . ."

[2] The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b), which provides in relevant part: "The following matters

of the trial court,[3] the defendant claims that the trial court improperly: (1) denied his motion to dismiss alleging that the state's failure to disclose certain exculpatory evidence prior to the probable cause hearing rendered his waiver of the hearing ineffective and deprived the trial court of in personam jurisdiction over him; (2) admitted his confession into evidence even though he had not been adequately advised of his *Miranda*[4] rights and had not knowingly and voluntarily waived those rights; and (3) failed to conduct an adequate inquiry into allegations of juror misconduct. We affirm the judgment of the trial court with respect to the first and second issues raised but reverse the judgment with respect to the third issue.

The jury reasonably could have found the following facts. On the night of November 1, 1993, the defendant had been drinking beer with Mark Aviles and Joanne Negron, fellow residents of the Willimantic YMCA. At some point, Aviles and the defendant left to purchase some marijuana. They encountered Fernando Ilarraza, the victim, on West Avenue in Willimantic and he offered to sell them marijuana. The defendant refused to buy from the victim, however, because he believed that he would be cheated. When Aviles and the defendant saw the victim later that evening, the defendant and the victim "exchanged looks." The defendant subsequently told Aviles that he intended to shoot the victim. Aviles and the defendant walked to a pay phone where the defendant called a friend who lived in a Willimantic neighborhood called Windham Heights. Aviles heard

shall be taken directly to the Supreme Court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony . . . for which the maximum sentence which may be imposed exceeds twenty years . . . ." Section 51-199 (b) has since been amended by Public Acts 1997, No. 97-178, § 2.

[3] The trial court sentenced the defendant to fifty years imprisonment.

[4] *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

the defendant tell the friend that he was going to "do the mission" and that he needed a "piece" to do it. Aviles and the defendant then walked back to the YMCA. The defendant asked Negron to telephone for a taxi to take him to Windham Heights. He returned with a .22 caliber revolver, which he cleaned and loaded in Negron's apartment. Thereafter, he left wearing a black hat, a full-length black coat, black pants and black boots.

Shortly before 11 p.m. that evening, a Coventry police officer, having just picked up a prisoner from the Willimantic police department, was traveling on Valley Street in Willimantic. He saw the body of the victim lying in the street, and contacted the Willimantic police. The victim was taken by ambulance to Windham Hospital where he was pronounced dead on arrival. An autopsy revealed that the victim had sustained two gunshot wounds, one behind the right ear and one to the right cheek. The gunshot behind the ear was fired from a distance of less than six inches and had caused the victim's death.[5]

When the defendant returned that night, Aviles asked him if he had killed the victim and the defendant replied that he had. The next day, Negron confronted the defendant about the shooting. The defendant told her that it was "something he had to do out of his heart" and that no one had told him to do it.

Aviles met with a Willimantic police officer and reported the information. Thereafter, the defendant was arrested and advised of his *Miranda* rights. When the officers asked him if he had shot the victim, the defendant responded, "si," and nodded his head affirmatively.

Yajira Vega, who lived on West Avenue, testified that she had seen the defendant and Aviles walking on West

---

[5] The murder weapon was not recovered. There was testimony that the bullets, which had been recovered from the victim's body, came from a .22 magnum handgun.

Avenue toward Valley Street. In addition, a taxi driver identified the defendant as the person he had driven from the YMCA to Windham Heights at approximately 9:30 p.m. on November 1.

The jury found the defendant guilty of murder. The trial court denied the defendant's motions for a new trial, for acquittal and in arrest of judgment, and rendered judgment in accordance with the jury verdict. This appeal followed. Additional facts will be set forth as they become relevant in the context of the defendant's specific claims.

I

We first address the defendant's claim that the trial court improperly concluded that his waiver of a probable cause hearing pursuant to General Statutes § 54-46a[6] was valid because: (1) the state failed to disclose certain allegedly exculpatory information necessary for the defendant to make a "knowing and intelligent

[6] General Statutes § 54-46a provides in relevant part: "Probable cause hearing for persons charged with crimes punishable by death or life imprisonment. (a) No person charged by the state, who has not been indicted by a grand jury prior to May 26, 1983, shall be put to plea or held to trial for any crime punishable by death or life imprisonment unless the court at a preliminary hearing determines there is probable cause to believe that the offense charged has been committed and that the accused person has committed it. The accused person may knowingly and voluntarily waive such preliminary hearing to determine probable cause.

"(b) . . . The court shall be confined to the rules of evidence . . . . No motion to suppress or for discovery shall be allowed in connection with such hearing. The accused person shall have the right to counsel and may attend and, either individually or by counsel, participate in such hearing, present argument to the court, cross-examine witnesses against him and obtain a transcript of the proceedings at his own expense. At the close of the prosecution's case, if the court finds that, based on the evidence presented by the prosecution, probable cause exists, the accused person may make a specific offer of proof, including the names of witnesses who would testify or produce the evidence offered. The court shall not allow the accused person to present such evidence unless the court determines that such evidence would be sufficient to rebut the finding of probable cause. . . ."

waiver"; and (2) the probable cause hearing was postponed beyond the statutorily required sixty day period without the defendant's personal consent.

A

The defendant contends that because the state had suppressed certain allegedly exculpatory information in violation of *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), his waiver of a probable cause hearing was invalid and, therefore, the trial court lacked personal jurisdiction over him. The defendant argues that he was unaware of this evidence when deciding whether to waive a probable cause hearing, that such evidence would have affected his decision to do so, and that, therefore, his waiver was invalid because it was not "accomplished with sufficient awareness of the relevant circumstances and likely consequences." (Internal quotation marks omitted.) *State* v. *Ramos*, 201 Conn. 598, 603, 519 A.2d 9 (1986). The state contends that the nondisclosure did not constitute a *Brady* violation because the evidence was not material to the defendant's decision to waive the probable cause hearing. We agree with the state.

The following additional facts are relevant to our resolution of this issue. On February 16, 1994, the defendant waived his right to a probable cause hearing and pleaded not guilty. In March, 1994, the defendant filed a motion for disclosure and production, requesting various types of exculpatory information. In July, a hearing was held in response to the defendant's subsequent motion for sanctions because of the state's noncompliance in disclosing the requested information. The trial court ordered that exculpatory information be disclosed and that any disputed evidence be submitted to the court. In September, 1994, the state turned over a copy of the file to the trial court, *Rittenband, J.*, for an in camera review. The court reviewed the file and

ordered the state to disclose the following documents to the defendant: (1) a statement by George Jiminez that many people disliked the victim; (2) a statement by Antonio LaBoy, a security guard at the middle school, that Nelson Lojica, the victim's fourteen year old nephew, had told him that the defendant had shot the victim; (3) a statement by Isabel Marcano, the victim's girlfriend, that the victim previously had fought with Ray Soto and Edwin "Pito" Mendez; (4) a statement by Mendez that Soto had obtained a gun from Jose Diaz and had stated to Mendez, "I did it," which comment Mendez assumed referred to the murder of the victim; (5) a police report in which Soto told police that "[the victim] was nothing but trouble" and that no one mourned his death; and (6) a police report describing an incident where Paul Casanova had threatened the victim because he was getting out of a local street gang. The trial court ordered the state to make continuing submissions of new information for in camera inspection.

During the first day of trial, Officer Raymond Evans testified that there were three women who had seen a man running from the scene. The next day, the defendant sought to obtain the statements of the women. The state explained that it was not intending to call any of the women as witnesses and that in the earlier review of the file, the trial court had not ordered the state to turn over any of this information to the defendant. After reviewing the statements, the trial court, *Sferrazza, J.*, ordered the state to give the statements of the women to the defendant despite the fact that the court did not "really see anything that's definitely exculpatory in these statements . . . ." The defendant also requested the statement of Paul Nelson, the man the women had seen running from the scene.

According to Nelson's statement, he was walking on Valley Street at approximately 10:40 p.m. on November

1, 1993, to go to work at a grocery store. He saw two young men, one walking and one riding a bicycle, approaching him. A few seconds after they had passed him, Nelson heard a gunshot. He looked back and saw the man who had been riding the bicycle lying in the street. Nelson started running and heard a second gunshot. When he looked back again, the man was lying in the street and the bicycle and the other person were gone. He ran to the grocery store and called the police. Although he did not see their faces, he described both men as having dark complexions. Nelson described the man who had been walking as short and wearing a waist-length brown leather jacket, a dark knit style hat, and sneakers or shoes that were partially white.

Upon review of the statement, the trial court ordered the state to give it to the defendant, concluding that although the court did not "think there's anything that is clearly exculpatory . . . it would be very helpful to the defense to have a more complete picture of what was observed at the time . . . ." The defendant thereafter filed a motion to dismiss, claiming that the state's nondisclosure of the allegedly exculpatory evidence had deprived him of his right to a probable cause hearing.[7]

A hearing was held on the defendant's motion to dismiss at which Nelson testified. The defendant's former attorneys, Pamela Favreau and Raymond Canning, also testified that they believed that Nelson's statement was "very exculpatory . . . [because] [i]t describes totally different clothing than that that was described by [Aviles and Negron] . . . ." In addition, both attorneys testified that they would not have advised the defendant to waive the probable cause hearing if they had been

---

[7] The defendant also filed a motion for a mistrial claiming that the state had suppressed the Nelson statement and that its "late disclosure irreparably prejudiced the defendant in that the statement could not be used in cross-examination of [Aviles]." The trial court denied the motion.

aware of Nelson's statement. The state argued that the statement previously had been determined not to be exculpatory. The statement was contained in the file that had been reviewed by the trial court in September, 1994, and the court had not ordered the state to turn it over to the defendant. The state further argued that the defendant was now in possession of the statement and had used it in cross-examining Aviles so that no prejudice resulted.

The trial court denied the defendant's motion to dismiss. The court concluded that the motion was untimely because the defendant was aware, prior to trial, of threats to the victim made by persons other than the defendant. Specifically, the court stated that the defendant had waived the issue of prejudice "by not raising these issues pretrial, as the Practice Book permits and requires . . . [and which] could have been raised, since . . . the primary exculpatory material was disclosed as early as September of 1994 . . . ." The court further stated that Nelson's statement was not "as exculpatory as the defense has characterized it. [Nelson's] statements concerning the description of the party being about five [feet] six [inches] seems to match the defendant. He could not tell the race although he thought the person had dark skin. He described the . . . coat . . . [as] brown. . . . [B]lack shoes—partially white. Given . . . that he was running away, it was dark . . . the discrepancies [can be explained by] the emotions at the time in a person who is acting under great stress . . . ." The court concluded that had a probable cause hearing been held and Nelson's statement admitted, probable cause likely would have been found in light of the defendant's statements to Aviles, Negron and two police officers.

Against this factual background, we apply the well established legal principles that govern our resolution of the defendant's claim. Pursuant to article first, § 8,

of the state constitution, as amended by article seventeen of the amendments,[8] and § 54-46a, a defendant charged with a crime punishable by death or life imprisonment is entitled to a probable cause hearing. "The Connecticut constitution . . . not only specifically guarantees this right to persons charged with serious crimes, it also makes such a hearing a jurisdictional prerequisite to continuing prosecution." *State* v. *Mitchell*, 200 Conn. 323, 334, 512 A.2d 140 (1986). "[O]ur reference to a jurisdictional prerequisite in *State* v. *Mitchell*, supra, [334] pertains, not to subject matter jurisdiction, but only to jurisdiction over the person of the defendant. . . . [D]efects . . . are waived if not seasonably raised." (Citations omitted; internal quotation marks omitted.) *State* v. *Niblack*, 220 Conn. 270, 276, 596 A.2d 407 (1991).

"[Section] 54-46a (a) provides that the accused person may knowingly and voluntarily waive such preliminary hearing to determine probable cause. In *Johnson* v. *Zerbst*, 304 U.S. 458, 464, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938), the United States Supreme Court articulated the classic definition of waiver, stating [that] a waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege. An effective waiver presupposes full knowledge of the right or privilege allegedly [being] waived and some act done designedly or knowingly to relinquish it. *State* v. *Toste*, 178 Conn. 626, 630, 424 A.2d 293 (1979); see *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 238, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973). Moreover, the waiver must be accomplished with sufficient awareness of the relevant circumstances

---

[8] Article first, § 8, of the Connecticut constitution, as amended by article seventeen of the amendments, provides in relevant part: "No person shall be held to answer for any crime, punishable by death or life imprisonment, unless upon probable cause shown at a hearing in accordance with procedures prescribed by law . . . ." Article seventeen of the amendments to the constitution was subsequently amended by article twenty-nine of the amendments, which is not relevant to this appeal.

and likely consequences. *State* v. *Shockley*, 188 Conn. 697, 706, 453 A.2d 441 (1982), quoting *State* v. *Reed*, 174 Conn. 287, 293, 386 A.2d 243 (1978)." (Internal quotation marks omitted.) *State* v. *Ramos*, supra, 201 Conn. 603.

"In *State* v. *Mitchell*, [supra, 200 Conn. 338], we held, on the basis of *Brady* v. *Maryland*, [supra, 373 U.S. 83], and its progeny, that [s]ince the adversarial probable cause hearing . . . is an essential part of a defendant's criminal prosecution, the constitutional obligation to disclose exculpatory material attaches at that time." (Internal quotation marks omitted.) *State* v. *McPhail*, 213 Conn. 161, 166, 567 A.2d 812 (1989).

"To prevail on a *Brady* claim, the defendant bears a heavy burden to establish: (1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and (3) that it was material. *State* v. *Milner*, 206 Conn. 512, 539, 539 A.2d 80 (1988). The test of materiality of nondisclosed exculpatory evidence requires that there be a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. . . . [W]here there is no reasonable probability that disclosure of the exculpatory evidence would have affected the outcome, there is no constitutional violation under *Brady*." (Citations omitted; internal quotation marks omitted.) *State* v. *McIntyre*, 242 Conn. 318, 323–24, 699 A.2d 911 (1997). "[T]he mere *possibility* that an item of undisclosed evidence *might* have helped the defense or *might* have affected the outcome . . . does not establish materiality in the constitutional sense." (Emphasis in original; internal quotation marks omitted.) *State* v. *Pollitt*, 205 Conn. 132, 149, 531 A.2d 125 (1987).

The defendant argues that had the state disclosed Nelson's statement in a timely manner, he would not

have waived his right to a probable cause hearing because Nelson's description of the clothing that the shooter was wearing "materially contradicted" the description of the defendant's clothing by Aviles and Negron. The defendant also argues that the trial court improperly focused on whether it was reasonably probable that disclosure of the evidence would have affected the trial court's determination of probable cause. The proper inquiry, the defendant contends, is whether it was reasonably probable that disclosure of Nelson's statement would have changed the defendant's decision to waive the hearing. We are unpersuaded.

The defendant's decision to waive the hearing is inextricably intertwined with, and dependent upon, an assessment of how the evidence would affect the trial court's determination of probable cause, so that the two cannot be analyzed separately. Whether the nondisclosure prejudiced the defendant by affecting his decision to waive his probable cause hearing depends in large part, if not completely, on a prediction of whether the evidence likely would have changed the outcome of the proceeding. See *Miller* v. *Angliker*, 848 F.2d 1312, 1322 (2d Cir.), cert. denied, 488 U.S. 890, 109 S. Ct. 224, 102 L. Ed. 2d 214 (1988). This is the inquiry that the trial court undertook.

The question of materiality requires "that the 'omitted evidence' be evaluated in the context of the whole record." *State* v. *Bember*, 183 Conn. 394, 406, 439 A.2d 387 (1981). "Furthermore, [t]he determination of materiality has been said to be inevitably fact-bound and like other factual issues is committed to the trial court in the first instance." (Internal quotation marks omitted.) *State* v. *Tomasko*, 242 Conn. 505, 518, 700 A.2d 28 (1997). The trial court determined that the evidence was not material after evaluating Nelson's statement in light of the statements of Aviles, Negron and the officers to whom the defendant indicated that he had killed the

victim. The court reasonably could have disregarded the testimony of the defendant's former attorneys, Favreau and Canning, that disclosure of the evidence would have changed their recommendation to the defendant to waive the probable cause hearing. "We cannot retry the facts or pass on the credibility of the witnesses." (Internal quotation marks omitted.) *Service Road Corp.* v. *Quinn*, 241 Conn. 630, 640, 698 A.2d 258 (1997). The trial court's conclusion is supported by Canning's testimony that a strategic consideration in the decision to waive the hearing was a recognition of the transient lodging of the state's witnesses and a desire to avoid preserving their testimony during a probable cause hearing for later use at trial. We agree with the trial court that the discrepancies between Nelson's description of the clothing worn by the shooter and the description of the defendant's clothing by Aviles and Negron, "while grist for the cross-examination mill at trial"; *State* v. *Gant*, 231 Conn. 43, 53, 646 A.2d 835 (1994), cert. denied, 514 U.S. 1038, 115 S. Ct. 1404, 131 L. Ed. 2d 291 (1995); were insufficient to rebut the state's evidence. We conclude that the defendant has not met his burden of showing the materiality of the state's nondisclosed evidence.

## B

The defendant next claims that he was deprived of his constitutional right to a probable cause hearing because his attorney, without his consent or knowledge, requested a postponement of the hearing beyond the statutorily prescribed period of sixty days. Section 54-46a (b) provides in relevant part: "Unless waived by the accused person or extended by the court for good cause shown, such preliminary hearing shall be conducted within sixty days of the filing of the complaint or information in Superior Court. . . ." The defendant claims that a waiver must be made by the defendant himself and cannot be made by his attorney. Because

the probable cause hearing was scheduled beyond the required time without the defendant's personal waiver, he contends that the trial court did not have in personam jurisdiction over him. This claim is without merit.

The procedural facts are undisputed. The defendant was arrested on November 3, 1993. On December 3, 1993, Canning requested that the date for the probable cause hearing be extended from January 3, 1994, until February 3, 1994, because the defense was "still doing some initial investigation." The transcript does not reflect that the defendant was present. Although Canning's request placed the probable cause hearing outside the prescribed sixty day period, the trial court, *Potter, J.*, granted the extension. On January 14, 1994, Canning again requested that the time for the probable cause hearing be extended. The trial court, *Rittenband, J.*, granted an extension until February 17, 1994. On February 16, 1994, the defendant waived the probable cause hearing and was canvassed as to his waiver.

The state correctly asserts that because this claim was not made in the trial court, we first consider whether the defendant is entitled to review under *State v. Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[9] We previously have recognized that the substantive right to a probable cause hearing accorded by article first, § 8, "is so intimately bound up with its procedural underpinnings that the procedures are the constituent parts of the right itself." *State v. Ramos*, supra, 201 Conn. 602. Because the defendant has a constitutional

[9] Under the *Golding* test, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) *State v. Golding*, supra, 213 Conn. 239–40.

right to a probable cause hearing according to the procedures set forth in § 54-46a, including the right to a hearing within the statutorily prescribed time period; id., 602–603; we will address his claim.

The state argues that a waiver of the sixty day period in which to hold the probable cause hearing may be asserted by the attorney for the defendant and does not require the defendant personally to appear and be canvassed. We agree.

In *Ramos*, we considered whether the defendant had waived his right to a probable cause hearing within the statutorily prescribed time period. Id., 599. We implied the defendant's waiver from his participation in the case of *State* v. *Sanabria*, 192 Conn. 671, 474 A.2d 760 (1984),[10] and concluded that he "relinquished any claim to his right to a probable cause hearing within the prescribed time period by consenting to the reservation in *Sanabria* prior to trial . . . [and] that [he] knowingly and voluntarily waived his right to a hearing within sixty days of the filing of an information . . . ." *State* v. *Ramos*, supra, 201 Conn. 604. Implicit in our decision in *Ramos* is that a personal express waiver of the sixty day period by the defendant is not required and that a waiver may be implied from the actions of his attorney acting on his behalf. If that is the case, waiver certainly can be found from a specific request by counsel for a postponement. "In some circumstances, a waiver of rights must be knowing, voluntary and intelligent, and it must be expressly made. . . . In other circumstances,

---

[10] The defendant in *Ramos*, along with other defendants convicted of crimes punishable by death or life imprisonment, was indicted by a grand jury after the date that article seventeen of the amendments to the Connecticut constitution, which provides for a probable cause hearing, was adopted. *State* v. *Ramos*, supra, 201 Conn. 600–601. The defendant challenged the denial of his motions for probable cause hearings. Id., 601. In *Sanabria*, the trial court, pursuant to General Statutes § 52-235, reserved questions to this court regarding the determination of the effective date of article seventeen of the amendments. *State* v. *Sanabria*, supra, 192 Conn. 673.

waiver can be implied . . . [and] [t]he waiver can be made by counsel . . . ." (Citations omitted.) *State* v. *Patterson*, 230 Conn. 385, 396, 645 A.2d 535 (1994), on appeal after remand, 236 Conn. 561, 674 A.2d 416 (1996). We conclude that a valid waiver occurred when Canning requested an extension of time in order to investigate.

## II

We next address the defendant's claim that the trial court improperly denied his motion to suppress certain allegedly incriminatory oral statements and communicative gestures that he had made because: (1) he had not been advised properly of his *Miranda* rights; and (2) the police had failed to obtain a knowing and voluntary waiver of his constitutional rights. We are unpersuaded.

Before turning to the defendant's claims, we first review the evidence presented at the pretrial suppression hearing at which the defendant and the two police officers who had interviewed him had testified. The state's evidence indicated that on the morning of November 3, 1993, Officer John Perez went to the Willimantic YMCA and asked the defendant, who at that time was considered a potential witness, if he was willing to go to the police station. The defendant agreed. State Police Trooper Jose Claudio joined them in the conference room. Claudio and Perez spoke to the defendant and each other in Spanish because the defendant was unable to speak English. The defendant initially was questioned about general biographical information, and later about his whereabouts on the night of the murder.

When the defendant left the room at approximately 11:30 a.m. to use the rest room, Claudio's supervisor informed him that the defendant had become a suspect in the homicide. Upon the defendant's return to the conference room, Claudio presented the defendant with a notice of rights and waiver form and read the rights on the form to him. Claudio asked the defendant if he

understood those rights and the defendant said that he did, and he initialed each line and signed the form, which was in Spanish. Claudio signed and dated the form and noted that the time was 11:40 a.m. Questioning continued for approximately thirty minutes until they broke for lunch, which was provided to the defendant.

After lunch the defendant, accompanied by the officers, left the police station and proceeded to Windham Heights where he pointed out the apartment he had visited on the night of the murder. They then proceeded to the YMCA, where, with the defendant's oral and written consent, the officers searched his room. While there, Claudio called his supervisor, who instructed him to bring the defendant back to the police station for additional questioning. The defendant agreed to return to the police station. Upon arriving at the police station at approximately 3:15 p.m., Claudio arrested the defendant and read him his *Miranda* rights from a notice of rights form, which the defendant signed. Claudio did not sign the form at that time. The form did not contain a waiver of rights. Claudio testified that he had asked the defendant if he understood his rights and the defendant had stated that he did. Claudio then asked him whether he was willing to answer questions and the defendant responded that he was. The defendant also stated that he had places to go and wanted to leave. Claudio explained that because the defendant was now under arrest, he was no longer free to leave.

The officers then resumed questioning and confronted the defendant with the information they had gathered. They accused the defendant of going to Windham Heights to get a gun. Perez accused the defendant of shooting the victim once in the back of the head and once in the face after he fell. The defendant nodded his head up and down and responded, "si." Claudio told the defendant that his mother would be disappointed to find out what he had done and the defendant responded,

"Yo se," which translates to "I know." The defendant refused, however, to give a written statement. When the questioning session concluded, the defendant was taken to be booked. At that time, Claudio signed the notice of rights form that had been presented to the defendant after his arrest and noted the time as 4:10 p.m.

A

The defendant claims that the trial court improperly concluded that he had been advised of his *Miranda* rights. The defendant contends that Claudio misrepresented the time when the warnings were administered, and asserts that the defendant was advised of his *Miranda* rights at 4:10 p.m., the time noted on the form, and not when he was arrested at 3:15 p.m., as Claudio had testified.

The resolution of the defendant's claim involves an assessment of credibility. "The question of the credibility of witnesses is for the trier to determine. . . . Where testimony is conflicting the trier may choose to believe one version over the other . . . as the probative force of the evidence is for the trier to determine." (Citation omitted; internal quotation marks omitted.) *State* v. *Madera*, 210 Conn. 22, 37, 554 A.2d 263 (1989). "Even where fact-finding implicates constitutional rights, and thus must be strictly scrutinized, questions of credibility are primarily within the province of the trier of fact." *State* v. *Alfonso*, 195 Conn. 624, 630, 490 A.2d 75 (1985). Claudio testified at the suppression hearing that the notice of rights form is customarily presented and completed at booking, and that although he had advised the defendant of his *Miranda* rights upon his arrest, he had signed the form when the defendant was being booked. The trial court, in rejecting the defendant's claim, expressly credited the testimony of Claudio and Perez that the defendant had been advised of his

*Miranda* rights upon his arrest and before questioning began, and not at 4:10 p.m. as the defendant alleges. The court further found that "[t]he defendant understood those rights" and that "his understanding was memorialized in written form." The court's conclusions are supported by testimony from both Claudio and Perez. Upon our review of the facts adduced at the hearing on the motion to suppress, we cannot conclude that the trial court improperly credited the testimony of Claudio and Perez over the testimony of the defendant.[11]

## B

The defendant next claims that the state failed to meet its burden of demonstrating that he voluntarily, intelligently and knowingly had waived his *Miranda* rights.[12] The defendant argues that his low level of intelligence and lack of education, coupled with his youth and inexperience with the police, are indicia that he did not fully understand his rights. The defendant argues that the trial court improperly failed to credit testimony that the defendant possessed a fifth grade

[11] Because we so conclude, it is unnecessary for us to address the state's argument that the earlier advisement of *Miranda* warnings at 11:30 a.m. was sufficient to deny the defendant's motion to suppress.

[12] The defendant contends that the trial court's denial of his motion to suppress violated the due process provisions of the federal and state constitutions.

Although the defendant invokes the due process provision contained in article first, § 8, of the Connecticut constitution, this claim is inadequately briefed. The defendant's assertion that Connecticut provides a more stringent waiver analysis under the state constitution than under the federal constitution is unaccompanied by any citation to legal authority. His argument that the "outrageous police behavior" in this case is violative of the state provision of due process similarly fails to present a specific legal analysis and is unaccompanied by any discussion of authority on the issue of police conduct during interrogation. We confine our analysis, therefore, to the federal constitution. See *State* v. *Varszegi*, 236 Conn. 266, 269 n.4, 673 A.2d 90 (1996); *State* v. *Crafts*, 226 Conn. 237, 243 n.3, 627 A.2d 877 (1993).

The fourteenth amendment to the United States constitution provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

education, did not speak English and was only marginally literate. We disagree.

The trial court found that, although the defendant did not execute a written waiver, he orally waived his *Miranda* rights by "knowingly, and voluntarily agree[ing] to continue to answer the officers' questions." The court noted that "[t]hroughout the time that the defendant was with the officers, he was sober, lucid, communicative, and responsive. He seemed to have sufficient mental and intellectual capacity to comprehend the advisements, waivers, and questions propounded. His responses to the officers' interrogation were voluntarily produced and arrived at without improper inducement, threat, or deprivation."

"The purpose of *Miranda* warnings is to assure that a confession is the product of an essentially free and unconstrained choice by its maker." (Internal quotation marks omitted.) *State* v. *Madera*, supra, 210 Conn. 48. "The state has the burden of proving by a preponderance of the evidence that the defendant knowingly and intelligently waived his *Miranda* rights, including his right to remain silent." *State* v. *Barrett*, 205 Conn. 437, 449, 534 A.2d 219 (1987). "[T]he state must demonstrate: (1) that the defendant *understood* his rights, and (2) that the defendant's *course of conduct* indicated that he did, in fact, waive those rights." (Emphasis in original; internal quotation marks omitted.) *State* v. *Shifflett*, 199 Conn. 718, 731–32, 508 A.2d 748 (1986). "In considering the validity of [a] waiver, we look, as did the trial court, to the totality of the circumstances of the claimed waiver." *State* v. *Madera*, supra, 49.

The determination of "[w]hether a defendant has knowingly and intelligently waived his rights under *Miranda* depends in part on the competency of the defendant, or, in other words, on his ability to understand and act upon his constitutional rights." (Internal

quotation marks omitted.) *State* v. *Toste*, 198 Conn. 573, 580, 504 A.2d 1036 (1986). To determine whether an individual had the capacity to understand the warnings, the trial court may consider: the defendant's experience with the police and familiarity with the warnings, his level of education, his intelligence including his IQ, his vocabulary and ability to read and write in the language in which the warnings were given, his age, intoxication, his emotional state and the existence of any mental disease, disorder or retardation. *State* v. *Whitaker*, 215 Conn. 739, 754, 578 A.2d 1031 (1990); *State* v. *Hernandez*, 204 Conn. 377, 396–97, 528 A.2d 794 (1987); *State* v. *Toste*, supra, 580–81.

Applying these principles to the present case, we conclude that the trial court properly determined that the state had met its burden of demonstrating that the defendant had the capacity to understand his rights and that he knowingly and voluntarily waived them by answering the officers' questions. The questioning was conducted in Spanish and was of brief duration, lasting from approximately 3:15 p.m. until 4:10 p.m., when he was taken to be booked. More important, the defendant himself testified at the suppression hearing that he understood his rights. Claudio testified that he asked the defendant if he would answer his questions and the defendant said he would but refused to make a written statement. Viewed in the context of his willingness to speak, the defendant's refusal to give a written statement is not dispositive. "In *State* v. *Harris*, [188 Conn. 574, 578, 452 A.2d 634 (1982), cert. denied, 460 U.S. 1089, 103 S. Ct. 1785, 76 L. Ed. 2d 354 (1983)], the defendant was unwilling to make a written statement before consultation with a lawyer, but nonetheless proceeded to make oral statements placing himself at the scene of the crime. We concluded that the defendant's expressed willingness to speak constituted an explicit affirmative act evidencing waiver, which the court

could reasonably find persuasive despite the defendant's refusal to sign the waiver form. Id., 580. In a similar vein, we held, in *State* v. *Frazier*, [185 Conn. 211, 225–26, 440 A.2d 916 (1981), cert. denied, 458 U.S. 1112, 102 S. Ct. 3496, 73 L. Ed. 2d 1375 (1982)], that a refusal to give a written statement does not, in itself, preclude a finding of waiver." (Internal quotation marks omitted.) *State* v. *Barrett*, supra, 205 Conn. 450–51. " 'The fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative' "; *State* v. *Madera*, supra, 210 Conn. 50; and under the circumstances of this case, may be construed as an affirmative act evidencing waiver.

The defendant's assertion that he possessed only a fifth grade education and attended special education classes is insufficient to compel a finding that he could not understand the meaning of his rights. We previously have concluded that a low level of education, although a factor to be considered, "is not in and of itself, determinative." Id., 43; see *State* v. *Correa*, 241 Conn. 322, 335, 340, 696 A.2d 944 (1997) (admission of statements by suspect with only five years of education); *State* v. *Madera*, supra, 210 Conn. 43–44 (admission of statements by suspect who functioned at third grade level, could not read or write but could write his name, identify numbers and do some counting); *State* v. *Hernandez*, supra, 204 Conn. 397 (admission of statements by suspect with IQ in borderline mentally retarded range); *State* v. *Toste*, supra, 198 Conn. 581 (admission of statements by suspect with low IQ, who functioned at sixth or seventh grade level).

The defendant's emotional condition is also insufficient to impair his ability to make a valid waiver. During the questioning, the defendant was "cry[ing] a little bit" and had his head down. Such conduct falls "far short of demonstrating . . . a lack of capacity. A distraught

emotional state . . . does not prevent a finding of voluntariness or of knowing and intelligent waiver." *State v. Harris*, supra, 188 Conn. 582.

The record is devoid of any evidence to support the defendant's characterization of the questioning as "third degree" interrogation. There is nothing in the record from which the court could infer that the conduct of Claudio and Perez "was such as to overbear [the defendant's] will to resist and bring about [a confession] not freely self-determined . . . ." (Internal quotation marks omitted.) *State v. DeAngelis*, 200 Conn. 224, 232–33, 511 A.2d 310 (1986). The officers testified that during the brief interview conducted after the defendant's arrest, they raised their voices and accused him of shooting the victim. Such conduct, in and of itself, is hardly sufficient to overcome the defendant's will. See *State v. Lapointe*, 237 Conn. 694, 732, 678 A.2d 942, cert. denied, 519 U.S. 994, 117 S. Ct. 484, 136 L. Ed. 2d 378 (1996) (false statement that defendant's fingerprints had been found on weapon did not render defendant's statement involuntary).

We conclude that the state has met its burden of proving, in light of the totality of the circumstances, that the defendant's waiver was knowing, intelligent and voluntary.

### III

Finally we address the defendant's claim that the trial court improperly restricted the scope of his inquiry into allegations of juror misconduct in violation of his federal and state constitutional rights.[13] The defendant,

[13] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ."

Article first, § 8, of the Connecticut constitution provides in relevant part: "In all criminal prosecutions, the accused shall have a right . . . to a speedy, public trial by an impartial jury. . . ."

who is Hispanic, alleges that the trial court abused its discretion in conducting the preliminary inquiry mandated under *State* v. *Brown*, 235 Conn. 502, 528, 668 A.2d 1288 (1995), into allegations that a juror referred to him as a "spic." Specifically, he asserts that the trial court abused its discretion by failing to recall: (1) June Briere, the juror who reported the alleged juror misconduct to the court, to testify in greater detail as to the circumstances of hearing these remarks; (2) any jurors who may have overheard such comments; and (3) the juror who allegedly had made the derogatory comments about him. The state argues that the trial court reasonably could have concluded that Briere's allegations were not credible and merited no further inquiry. We agree with the state that the trial court did not abuse its discretion in conducting the preliminary inquiry into the allegations. We exercise our supervisory authority, however, to extrapolate the guidelines that we provided in *Brown* to address the extraordinary situation in which a juror is alleged to have made racial slurs.

The following additional facts are relevant. The jury reached a verdict on February 27, 1996. The trial court received a letter dated March 27, 1996, from Briere stating that she was not certain of the defendant's guilt and implied that even if he was guilty, his act had the benefit of stopping the victim from selling drugs.[14] On

[14] The letter to the trial court provided:

"I have contemplated the circumstances and sentencing of [the defendant] for a month. At the time he was found guilty, I was not certain he was guilty and still question the facts. I do believe if he had ever taken the stand and said no I did not do it or that he signed a statement under duress he never would have been found guilty. I personally would not have found him guilty.

"My feelings are if he did commit this crime against [the victim] how many parents/children did he save from the heartbreak of drug abuse, or from a person selling that stuff to our children.

"Upon sentencing of [the defendant] on April 4, 1996, I pray you take into consideration the time he has served to date. I would like to help this young man get his life on the right side of the law. I feel there is alot of good in this young man and I do plan to be in court that date if nothing but moral support for him and his loved ones. I also in the future plan to help him

April 3, 1996, Briere attempted to telephone the trial court but instead was referred to the court clerk. According to a written report of the conversation prepared by the clerk, Briere informed her that: (1) she had conducted her own investigation and had found evidence that the defendant was innocent; (2) she intended on testifying on his behalf; (3) she was pressured by the other jurors to find him guilty; and (4) on one occasion one of the jurors returned from lunch and reported conversations that he overheard in a restaurant in which the defendant was referred to as a "spic."[15]

Briere was present in court when the defendant appeared on April 4, 1996, for posttrial motions and to be sentenced. The trial court indicated on the record that it had "received a communication from one of the jurors, Ms. Briere. . . . And, also, I understand that the counsel may have been communicated to by that same juror and also the clerk was contacted yesterday by Ms. Briere indicating some other information." Mark Shapera, the defendant's attorney, then informed the court that Briere had contacted him the week before and told him "that one of the jurors in deliberation, a male juror that she didn't know the name of, had said,

and his family in any way I can possible to enjoy our great country.

"Thank you for the time you have given me to air my feelings."

Briere's letter was made a court exhibit and part of the file.

[15] The court clerk's report provided:

"On [April 3, 1996] at approximately 2:45 p.m., I spoke with June Briere regarding [the defendant]. She indicated to me that she conducted her own investigation on the streets of Willimantic and found existing evidence that [the defendant] is innocent. She stated that on April 4, 1996, she intends to testify on [the defendant's] behalf. Ms. Briere also stated that she was pressured by the other jurors to find [the defendant] guilty. She stated that on one occasion one of the jurors returned from lunch and reported conversations he heard in a restaurant referring to [the defendant] as a 'spic.'

"My conversation with Ms. Briere was emotional and disorganized on her part. She indicated that she was concerned about 'breaking down' on the stand. She stated that she has previously spoken to [defense counsel] Shapera and is attempting to have her own attorney present on April 4, 1996."

in an attempt to convince the other jurors as to [the defendant's] guilt, the following statements: 'What do you care about a spic? Let's get one more spic off the streets of Willimantic,' and 'Of course he's guilty, he's a spic.'. . . And also . . . 'He's a spic. He's guilty. One less spic on the street.' " Briere then took the stand.

The court asked Briere to explain the "very different statements" she had given to the clerk and to Shapera.[16]

[16] The colloquy between the trial court and Briere provides in relevant part:

"The Court: All right. Ms. Briere, you were in the courtroom and heard that, I assume, that you just heard—

"Ms. Briere: Yes, I did.

"The Court:—a recitation by Attorney Shapera as to what you related to him. You also heard a recitation by me of what you related to the clerk yesterday. They seem to be very different statements. Can you explain what—

"Ms. Briere: No, they were not different statements, sir.

"The Court: They're not different statements?

"Ms. Briere: We went back into jury deliberation that day and that was the first thing out of that guy's mouth.

"The Court: Was what?

"Ms. Briere: 'He's a spic and he's guilty.' And I did not know what a spic was.

"The Court: Okay. Why didn't you report that to anyone when it happened?

"Ms. Briere: Because I was afraid.

"The Court: What were you afraid of?

"Ms. Briere: I was under pressure, sir.

"The Court: What kind of pressure were you claiming that you were under?

"Ms. Briere: My son had been committed during that trial to the [psychiatric] ward at Day Kimball Hospital and my father underwent emergency surgery at midnight one night and I was under a lot of stress.

"The Court: But that doesn't explain why you wouldn't report such a remarkable incident to the court.

"Ms. Briere: Because I didn't know, you told me I couldn't talk to my husband. I couldn't talk to no one. I didn't know what to do.

"The Court: I also instructed you that if anyone approached you or gave you information that they shouldn't have, you were to report that to the sheriff, to the court through the sheriff.

"Ms. Briere: Right. But I was afraid, sir.

"The Court: But you didn't report that. Well, why did you tell the clerk yesterday a very different story than you told—

"Ms. Briere: I don't remember telling her a different story. I was crying. I was very upset.

"The Court: You don't recall telling the clerk yesterday that on one occasion one of the jurors returned from lunch and reported overhearing a

Briere denied that they were different statements and clarified that when "[w]e went back into jury deliberation that day . . . that was the first thing out of that guy's mouth. . . . 'He's a spic and he's guilty.' "[17] The court inquired why she did not report this earlier and she replied that she was under stress and was not sure what to do. Briere explained that she was crying and upset at the time she spoke to the clerk and that she did not think she had to tell her everything because she had already told Shapera what she had heard. Lastly, the court inquired why her letter contained no mention of these allegations and Briere explained that she was unaware that she could have informed the court of what happened in that manner.

The trial court then dismissed Briere and stated that further investigation was warranted regarding the allegations. The court ordered that the jury foreperson,

conversation in a restaurant?

"Ms. Briere: Yes, I did tell her that.

"The Court: Okay. Is that the same juror that you're talking about—

"Ms. Briere: Yes, it is.

"The Court:—making the other comments? Then why didn't you mention to [the clerk] these other comments that you mentioned to Attorney Shapera?

"Ms. Briere: Because I didn't think I had to tell her all this. I had already talked to Mr. Shapera about it.

"The Court: Well, you told her about the restaurant but you didn't think it was significant to tell her about all these other—

"Ms. Briere: No, I did not.

"The Court:—comments that a juror made?

"Ms. Briere: Sir, do you know what I'm under?

"The Court: Okay. No, I don't. What are you—

"Ms. Briere: I'm under a lot of pressure.

"The Court: Okay. The letter that you wrote to me also doesn't make any mention—

"Ms. Briere: I made no mention of it.

"The Court:—of this whatsoever.

"Ms. Briere: No, I didn't know I could do that.

"The Court: But you did mention other things—

"Ms. Briere: Right."

[17] Although Briere did not know the name of the juror who allegedly had made the comments, she did provide a description of him such that both the trial court and the defendant's attorney were able to identify him.

rather than all the other jurors, be notified to appear before the court. The court indicated that it would recall the other jurors if the foreperson's testimony indicated that it was warranted. Shapera requested time to obtain the transcript of the voir dire and the matter was continued until May 3, 1996.

Upon resumption of the inquiry on May 3, the court examined Paul Belanger, the jury foreperson. The court informed him that there was an allegation that during deliberations a juror had made ethnic slurs against the defendant and the court repeated the specific comments that Briere had told Shapera. Belanger stated that he did not recall any ethnic slurs being made by any of the jurors. He did offer that before deliberations began, there was some discussion of the jury pool and that someone in the jury pool was very racist.[18] Shapera asked Belanger if he heard anyone mention anything that had occurred over the lunch break and Belanger said that he had not. When asked about the particular juror suspected of making the remarks, Belanger stated that he did not eat lunch with him or have any discussions with him. Shapera asked if it was possible that jurors could have made remarks in the deliberation room that Belanger did not hear and Belanger replied, "I suppose it's possible if they said it low under their breath. I don't believe that happened though."

Shapera then requested that Briere be recalled to provide additional details about the circumstances in which she had heard the juror make the ethnic slurs. Shapera also requested that the court interview the juror who allegedly had made the comments and those jurors who had been seated near him who might have overheard him. The court denied the request, stating

---

[18] The incident Belanger referred to involved a venireperson who, while waiting for voir dire, had been overheard by other venirepersons to make ethnic slurs, including repeated references to the defendant as a "spic." That venireperson was dismissed.

that the inquiry as conducted had satisfied the preliminary investigation required under *State* v. *Brown,* supra, 235 Conn. 528. The court concluded that Briere's allegations were not credible. The court cited as grounds for its conclusion: (1) the discrepancy between what Briere had told the clerk she had heard and what she had told Shapera; (2) the court's conclusion that "[h]er actions after [the trial] indicate to me a total loss of objectivity with regard to the defendant. . . . It is clear to me that she's become a champion of the defendant's side."; and (3) the court's assessment that, in view of the fact that an individual in the jury assembly room previously had been disqualified for making racial comments, it was "inconceivable" that an incident such as the one Briere reported would have occurred and "not one of the . . . other jurors would have found [it] so serious . . . and inflammatory, to report it to the court."[19]

---

[19] The trial court's decision on Shapera's request provided in relevant part:

"I'm going to deny the request [for further inquiry]. I have engaged in the preliminary investigation that's required under *State* v. *Brown,* [supra, 235 Conn. 502] . . . . That [case] indicates that the form and scope of the investigation is within the discretion of the trial court. I am thoroughly satisfied that the allegations made by juror Briere absolutely never occurred. I have not only heard the testimony of the foreperson, who was present throughout the deliberations, that this did not happen. . . . I question the reliability of Ms. Briere. She acknowledged being under a lot of stress—during the trial and afterward. Her actions afterward indicate to me a total loss of objectivity with regard to the defendant. Her reports to the court concerning what happened were contradictory and the omissions were glaring. The first report to the court . . . made no mention of any ethnic slurs—whatsoever. Her letter to the court was concerning her having misgivings about her . . . vote . . . . [S]he was questioning whether . . . the verdict might not have been correct [and whether] he might be actually innocent. Nothing to do with any ethnic background, or misconduct on any part of a juror. And I find it absolutely impossible to believe—that she would not have mentioned such a glaring transgression to the court.

"She then talked to the clerk, the day before we had the hearing. And her report of what occurred was totally different from the report that apparently she gave to [Shapera] . . . and indicated on the stand. Her claim of misconduct at that time, was that one of the jurors came back and said that they had overheard something over lunch. Again—it seems inconceivable to me that a person would leave out the most essential, critical, important

"Jury impartiality is a core requirement of the right to trial by jury guaranteed by the constitution of Connecticut, article first, § 8, and by the sixth amendment to the United States constitution. . . . [T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors. . . . The modern jury is regarded as an institution in our justice system that determines the case solely on the basis of the evidence and arguments given [it] in the adversary arena after proper instructions on the law by the court. . . . Consideration [by the jury] of extrinsic evidence is presumptively prejudicial because it implicates the defendant's constitutional right to a fair trial before an impartial jury." (Citations omitted; internal quotation marks omitted.) *State* v. *Brown*, supra, 235 Conn. 522–23.

---

aspects of it, and mention some trivial matter. It is clear to me that she's become a champion of the defendant's side. She's been in communication with him in prison, with his family, and she's here today with family members.

"I believe that . . . there was in fact someone in the jury assembly room, the first or second day we were here, that clearly made some comments. In fact they admitted it here, and that person was disqualified. Whether Ms. Briere is acting out of deception or delusion, based on an overwhelming sense of responsibility for having participated in . . . finding [the defendant] guilty—I don't have to answer.

"I note that [Shapera], in [his] voir dire, very carefully and thoroughly went over, with every juror, how important it was not to consider the ethnic background of the defendant and to hold it against him and [Shapera] . . . received the information from the jurors that actually sat, indicating that they would not do that. . . . And also the court gave instructions that their verdict was not to be based on prejudice or bias toward [the defendant]. It's also inconceivable to me that . . . the incident that was reported by Ms. Briere, would have occurred and not one of the eleven . . . other jurors would have found [it] so serious . . . and inflammatory, [as] to report it to the court.

"And for these reasons I am . . . thoroughly convinced that the allegation of misconduct never occurred, and there's no need for any further investigation. I'm not going to bring other jurors back. I'm satisfied.

\* \* \*

"I've made a factual finding that there was no eleventh juror who indicated, or had any ethnic bias or prejudice. I found that Ms. Briere is not credible in that statement. . . . [T]hat's my factual finding."

Our review of the scope of the trial court's preliminary inquiry into allegations of jury misconduct is governed by *State* v. *Brown,* supra, 235 Conn. 502. In *Brown,* we exercised our supervisory authority over the administration of justice to "hold that . . . a trial court must conduct a preliminary inquiry, on the record, whenever it is presented with any allegations of jury misconduct in a criminal case, regardless of whether an inquiry is requested by counsel." Id., 526. We reiterated that "the trial court has broad discretion to determine the form and scope of the proper response to allegations of jury misconduct"; id., 523–24; and instructed that "[i]n exercising that discretion, the trial court 'must zealously protect the rights of the accused.'" Id., 524. Our role as an appellate court is "limited . . . to a consideration of whether the trial court's review of alleged jury misconduct can fairly be characterized as an abuse of its discretion." Id.

We instructed that the trial court should consider the following factors in exercising its discretion as to the form and scope of a preliminary inquiry into allegations of jury misconduct: (1) the criminal defendant's substantial interest in his constitutional right to a trial before an impartial jury; (2) the risk of deprivation of the defendant's constitutional right to a trial before an impartial jury, which will vary with the seriousness and the credibility of the allegations of jury misconduct; and (3) the state's interests of, inter alia, jury impartiality, protecting jurors' privacy and maintaining public confidence in the jury system. Id., 530–31.

In our review of the trial court's decision in the present case, we are mindful that "[a]ny assessment of the form and scope of the inquiry that a trial court must undertake when it is presented with allegations of jury misconduct will necessarily be fact specific." Id., 531. The circumstances in each case will necessarily vary and each situation is sui generis. *United States* v.

*Barnes*, 604 F.2d 121, 144 (2d Cir. 1979), cert. denied, 446 U.S. 907, 100 S. Ct. 1833, 64 L. Ed. 2d 260 (1980).

The task that faced the trial court in striking a careful balance between the significant and competing interests of the defendant and the state was not only delicate but difficult. See *United States* v. *Thomas*, 116 F.3d 606, 618 (2d Cir. 1997) (trial "[c]ourts face a delicate and complex task whenever they undertake to investigate reports of juror misconduct or bias"). We acknowledged in *Brown* that "[t]here may well be cases . . . in which a trial court will rightfully be persuaded, solely on the basis of the allegations before it and the preliminary inquiry of counsel on the record, that such allegations lack any merit." *State* v. *Brown*, supra, 235 Conn. 528. Such was the case here. The trial court found that Briere's testimony, coupled with that of the foreperson, was dispositive as to the credibility of the allegations. Because of the flexibility of the balancing test that we articulated in *Brown*, we cannot conclude that the trial court's determination that no further inquiry was warranted was an abuse of its discretion. This, however, does not end our inquiry because we invoke our supervisory authority to consider and establish the scope of the inquiry that a trial court should undertake in future cases when presented with allegations of ethnic bias on the part of a juror.[20]

"Appellate courts possess an inherent supervisory authority over the administration of justice. . . . The standards that [are] set under this supervisory authority are not satisfied by observance of those minimal historic safeguards for securing trial by reason which are

---

[20] "We have plenary authority to pursue this course sua sponte although this ground for relief was not explicitly articulated below or in the briefs in this court. See *State* v. *Smith*, 207 Conn. 152, 163, 540 A.2d 679 (1988); *State* v. *Gilnite*, 202 Conn. 369, 373, 521 A.2d 547 (1987); *Greenwood* v. *Greenwood*, 191 Conn. 309, 315, 464 A.2d 771 (1983)." *State* v. *Ross*, 208 Conn. 156, 159 n.1, 543 A.2d 284 (1988).

summarized as due process of law . . . . Rather, the standards are flexible and are to be determined in the interests of justice. . . . [O]ur supervisory authority is not a form of free-floating justice, untethered to legal principle." (Citations omitted; internal quotation marks omitted.) *State* v. *Pouncey*, 241 Conn. 802, 812–13, 699 A.2d 901 (1997). Rather, the integrity of the judicial system serves as a unifying principle behind the seemingly disparate use of our supervisory powers. See *State* v. *Hines*, 243 Conn. 796, 815, 709 A.2d 522 (1998) ("[o]ur supervisory powers are invoked only in the rare circumstance where [the] traditional protections are inadequate to ensure the fair and just administration of the courts"); *State* v. *Coleman*, 242 Conn. 523, 540, 700 A.2d 14 (1997) ("[w]e previously have exercised our supervisory powers 'to direct trial courts to adopt judicial procedures that will address matters that are of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole' "). Under our supervisory authority, we have adopted rules intended to guide the lower courts in the administration of justice in all aspects of the criminal process. See, e.g., *State* v. *Coleman*, supra, 542 (judicial explanation required for imposition of greater sentence after trial than after plea); *State* v. *Gould*, 241 Conn. 1, 15, 695 A.2d 1022 (1997) (videotaped deposition must be played in open court, not in jury room); *State* v. *Brown*, supra, 235 Conn. 528 (judicial inquiry on the record into allegations of juror misconduct); *State* v. *Breton*, 235 Conn. 206, 250, 663 A.2d 1026 (1995) (special verdict form submitted to jury in capital sentencing case must include brief statement of jury's responsibility for determining whether defendant is sentenced to death); *State* v. *Jones*, 234 Conn. 324, 346–47, 662 A.2d 1199 (1995) (bifurcation of jury proceedings in certain death penalty cases); *State* v. *Patterson*, 230 Conn. 385, 397–400, 645 A.2d 535 (1994),

on appeal after remand, 236 Conn. 561, 674 A.2d 416 (1996) (trial judge must continuously be present to oversee voir dire); *State* v. *Holloway,* 209 Conn. 636, 645–46, 553 A.2d 166, cert. denied, 490 U.S. 1071, 109 S. Ct. 2078, 104 L. Ed. 2d 643 (1989) (where defendant asserts claim under *Batson* v. *Kentucky,* 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 [1986], state must make prima facie showing of neutral jury selection method).

Although "[w]e previously have exercised our supervisory powers 'to direct trial courts to adopt judicial procedures' "; *State* v. *Coleman,* supra, 242 Conn. 540; we also have exercised our authority to address the result in individual cases, notably those involving instances of prosecutorial misconduct because we recognize that such conduct, although not rising to the level of constitutional magnitude, is "unduly offensive to the maintenance of a sound judicial process." (Internal quotation marks omitted.) *State* v. *Fullwood,* 194 Conn. 573, 584, 484 A.2d 435 (1984); see *State* v. *Cohane,* 193 Conn. 474, 499, 479 A.2d 763, cert. denied, 469 U.S. 990, 105 S. Ct. 397, 83 L. Ed. 2d 331 (1984) (ordering that conviction be set aside and new trial held because of prosecutorial misconduct); *State* v. *Ubaldi,* 190 Conn. 559, 570, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983) (ordering new trial).

The exercise of our supervisory authority in the present case is particularly appropriate because of the nature of the juror misconduct. "We previously have exercised our inherent supervisory authority to safeguard against the improper consideration of race in criminal trials; see *State* v. *Holloway,* supra, 209 Conn. 645–46; and we will not hesitate to do so again if necessary." *State* v. *Pouncey,* supra, 241 Conn. 816–17. "[I]t is the jury that is a criminal defendant's fundamental 'protection of life and liberty against race or color preju-

dice.' " *McCleskey* v. *Kemp*, 481 U.S. 279, 310, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987). Accordingly, an allegation that a juror is racially biased "strikes at the heart of the [defendant's] right to a trial by an impartial jury and the right to equal protection." *State* v. *Brown*, 232 Conn. 431, 453, 656 A.2d 997 (1995), superseded on other grounds, *State* v. *Brown*, supra, 235 Conn. 502. In addition, public confidence in the fair administration of justice is undermined if such allegations are not thoroughly investigated and quashed. "Discrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice." *Rose* v. *Mitchell*, 443 U.S. 545, 555, 99 S. Ct. 2993, 61 L. Ed. 2d 739 (1979). Prejudice "negates the defendant's right to be tried on the evidence in the case and not on extraneous issues. . . . More than just harm to the individual defendant is involved, however. For the introduction of racial prejudice into a trial helps further embed the already too deep impression in public consciousness that there are two standards of justice in the United States, one for whites and the other for [minorities]. Such an appearance of duality in our racially troubled times is, quite simply, intolerable . . . ." (Citation omitted.) *United States ex rel. Haynes* v. *McKendrick*, 481 F.2d 152, 157 (2d Cir. 1973). The intransigent nature of racial prejudice in our society is an unfortunate truth. See *Adarand Constructors, Inc.* v. *Pena*, 515 U.S. 200, 237, 115 S. Ct. 2097, 132 L. Ed. 2d 158 (1995) ("[t]he unhappy persistence of both the practice and the lingering effects of racial discrimination against minority groups in this country is an unfortunate reality"); *Rose* v. *Mitchell*, supra, 558 ("we . . . cannot deny that, 114 years after the close of the [w]ar [b]etween the [s]tates . . . racial and other forms of discrimination still remain a fact of life, in the administration of justice as in our society as a whole").

Allegations of racial bias on the part of a juror are fundamentally different from other types of juror misconduct because such conduct is, ipso facto, prejudicial[21] and because the judicial system is not exempt from the unfortunate reality of racial prejudice. A trial court must be especially vigilant in investigating the specter of racial prejudice in the judicial process. Failure to scrupulously explore such allegations would seem to enhance the risk of a conviction based on race. Such a risk cannot be tolerated. We emphasize that the standard of review, on appeal, remains an abuse of discretion. *State* v. *Brown*, supra, 235 Conn. 524. Our decision to provide additional guidelines for conducting a preliminary inquiry in situations of racial allegations in no way undermines the discretion we accord to the trial courts in making credibility assessments and determining the scope and form of inquiries. We exercise our supervisory authority in the present case to expand the scope of the preliminary inquiry because allegations of racial slurs are so inherently prejudicial as to merit additional scrutiny.

The overarching principle behind the scope of the preliminary inquiry into allegations of juror misconduct is that "the breadth of questioning should be sufficient to permit the entire picture to be explored . . . ." (Citation omitted; internal quotation marks omitted.) *United*

---

[21] We have recognized that "not every incident of juror misconduct requires a new trial. . . . The question is whether or not the misconduct has prejudiced the defendant to the extent that he has not received a fair trial. . . . The defendant has been prejudiced if the misbehavior is such to make it probable that the juror's mind was influenced by it so as to render him or her an unfair and prejudicial juror." (Citations omitted; internal quotation marks omitted.) *State* v. *Newsome*, 238 Conn. 588, 627–28, 682 A.2d 972 (1996). Juror misconduct involving exposure to extrinsic material such as a dictionary; *State* v. *Asherman*, 193 Conn. 695, 736–37, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985); or a newspaper article or involving the deliberation process such as presubmission discussion among the jurors; *State* v. *Newsome*, supra, 629–30; simply do not pose the level of seriousness and likelihood of prejudice to the defendant as a juror who is racially biased.

*States* v. *Moon*, 718 F.2d 1210, 1234 (2d Cir. 1983), cert. denied, 466 U.S. 971, 104 S. Ct. 2344, 80 L. Ed. 2d 818 (1984). Because a trial court's response to an allegation of racial bias on the part of a juror necessarily will vary by the content and circumstances of the allegations, we utilize the present case as a framework for establishing the contours of the inquiry in future cases. In the present case, the trial court, after hearing Briere's testimony, did not determine that the allegations were not credible. Instead, the court concluded that further inquiry was warranted, stating that "it's clear that we're going to have to conduct *further investigation* on this matter." (Emphasis added.) The court subsequently decided to recall the jury foreperson.

We do not disagree with the dissent that it is within the discretion of the trial court to make credibility assessments and determine whether the allegations are facially credible.[22] In the present case, the trial court concluded that the allegations merited no further inquiry *after* hearing the testimony of the jury foreperson.[23] We note that no inquiry was made of Briere regarding the circumstances in which she had heard the remarks and specifically who had been present at

---

[22] We adhere to the principle that we articulated in *Brown* that "[t]here may well be cases . . . in which a trial court will rightfully be persuaded, solely on the basis of the allegations before it . . . that such allegations lack any merit." *State* v. *Brown*, supra, 235 Conn. 528. Contrary to the dissent's assertion, our expansion of the inquiry established in *Brown* does not invite unwarranted investigation into "outlandish" claims. Our premise remains that where facially credible allegations are made, a certain specific inquiry should follow.

[23] The dissent appears to argue that Briere's allegations were not credible because of the "inconsistencies" in her statements. We first note that the trial court initially did not dismiss her allegations but sought additional information. Second, we note that Briere gave the same statement to Shapera as she did in court, she was able to accurately identify the juror alleged to have made the remarks, and she was able to pinpoint the precise time when the remarks were made. We cannot disagree with the trial court that the allegations were facially credible without pursuing further inquiry, as the trial court aptly concluded was necessary.

the time. The trial court, and the dissent, presumed that the remarks had been made to the entire jury and that, therefore, the testimony of the foreperson that he did not hear such remarks was dispositive.[24] The record does not indicate that Briere either had mentioned that Belanger was present or that there had existed any nexus between her allegations and Belanger. Briere's testimony was simply that when the jury "went back into jury deliberation that day . . . the first thing out of that guy's mouth . . . [was] '[h]e's a spic and he's guilty.' " See footnote 16 of this opinion. Although the trial court's determination that no further inquiry was merited was not an abuse of discretion, in future cases, the trial court should explore the context of such remarks fully to flesh out the details. Such details are critical to determining whether further inquiry is warranted. The inquiry of the juror making the allegations may disclose the identity of other persons who possess knowledge as to the veracity of the allegations, an area that should be explored so that such persons may be interviewed. In future cases involving racial allegations, we conclude that the interview with the person reporting such remarks should include the context of the remarks and should seek to identify other persons who were in a position to state what, if anything, they had heard.

Finally, we are persuaded that in the case of alleged ethnic references to a criminal defendant by a juror the inquiry we established in *Brown* should include direct questioning of the juror alleged to have made the prejudicial comments. We so conclude because "determinations made in . . . hearings [inquiring into allegations of juror bias] will frequently turn upon testimony of the

[24] The record does not support the dissent's characterization of the racial slurs made by the juror as "blatant" and "forceful." The record is silent as to the tone of voice in which the remarks were made as well as to the audience to whom they were directed.

juror in question . . . ." *Smith* v. *Phillips*, 455 U.S. 209, 217 n.7, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982). Such an interview "permits the trial judge to observe the juror's demeanor under cross-examination and to evaluate his answers in light of the particular circumstances of the case." Id., 222 (O'Connor, J., concurring). "Since reliable evidence can be gained from such an interview, it follows that conducting one will usually decrease the risk of a wrong decision on the issue of juror partiality." *Neron* v. *Tierney*, 841 F.2d 1197, 1202 (1st Cir.), cert. denied, 488 U.S. 832, 109 S. Ct. 90, 102 L. Ed. 2d 66 (1988).

Extending the preliminary inquiry we required in *Brown* in situations of alleged racial bias beyond an initial inquiry of the individual reporting the conduct to encompass the interview of key players will not, we believe, prove any more disruptive of the judicial process than *Brown* has proven to be. We are cognizant that the state's interests, after a jury verdict has been accepted, "in the finality of judgments . . . in protecting the privacy and integrity of jury deliberations, [and] preventing juror harassment" favor proceedings more limited in form and scope. (Citations omitted.) *State* v. *Brown*, supra, 235 Conn. 531. We do not disagree with the principle that courts should be hesitant to recall jurors after they have reached a verdict. *Neron* v. *Tierney*, supra, 841 F.2d 1205. There are, however, as we have noted previously in this opinion, compelling countervailing state interests in a situation where a juror is alleged to be racially biased that support extending the inquiry beyond merely the person who reports the conduct and the foreperson. Further inquiry is warranted to maintain the confidence of the public in the administration of justice. "An important function of this court is to ensure public confidence in the integrity of the judicial system." *State* v. *Coleman*, supra, 242 Conn. 541. We cannot permit the jury's nor the

public's attention to be diverted "from the ultimate question of guilt or innocence that should be the central concern in a criminal proceeding"; *Stone* v. *Powell*, 428 U.S. 465, 489–90, 96 S. Ct. 3037, 49 L. Ed. 2d 1067 (1976); by the extraneous and irrelevant consideration of an immutable characteristic such as race or ethnicity, nor can we tolerate the suggestion that race or ethnicity played any role in the conviction of a criminal defendant.

In summary, we conclude that an allegation of racial bias on the part of a juror differs so fundamentally from other types of juror misconduct that *Brown* is of limited guidance and does not go far enough. Because such allegations are a matter of "utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole"; (internal quotation marks omitted) *State* v. *Brown*, supra, 235 Conn. 528; in the exercise of our inherent supervisory authority over the administration of justice, we deem it appropriate in all future cases in which a defendant alleges that a juror has made racial epithets, such as in the present case, that the trial court should conduct a more extensive inquiry than that prescribed in *Brown*. Such inquiry should include, at a minimum, an extensive inquiry of the person reporting the conduct, to include the context of the remarks, an interview with any persons likely to have been a witness to the alleged conduct, and the juror alleged to have made the remarks.

The judgment with respect to the issues of the waiver of the probable cause hearing and the motion to suppress the defendant's statements is affirmed; the judgment with respect to the trial court's decision not to conduct further inquiry into the allegations of juror misconduct is reversed and the case is remanded for further proceedings consistent with this opinion.[25]

---

[25] In his oral argument to this court, the defendant claims, without reference to any legal authority, that should we decide to remand for further

In this opinion KATZ and PALMER, Js., concurred.

CALLAHAN, C. J., with whom MCDONALD, J., joins, concurring in part and dissenting in part. I agree with the conclusion reached in parts I and II of the majority opinion. I do not agree, however, with part III of the opinion, in which the majority invokes our supervisory powers to create a per se rule requiring trial courts to conduct a structured evidentiary hearing into any allegations of juror misconduct related to ethnic or racial bias.[1] As the majority aptly recognizes, this decision is controlled by our recent decision in *State* v. *Brown*, 235 Conn. 502, 668 A.2d 1288 (1995), in which we exercised our supervisory power to adopt a rule of general applicability mandating that trial courts must

proceedings, a different judge should be assigned. This issue was not briefed by either party. Our practice requires an appellant to raise claims in his original brief, "so that the issue as framed by him can be fully responded to by the appellee in its brief, and so that we can have the full benefit of that written argument." (Internal quotation marks omitted.) *State* v. *Garvin*, 242 Conn. 296, 312, 699 A.2d 921 (1997). We will, however, address the claim. The defendant argues that the trial court was "hostile" to Briere and, having made a determination that Briere was not credible, will not be impartial in conducting the warranted inquiry. We disagree. There is simply no evidence in the record to support the defendant's claim. In questioning Briere, the court properly explored the perceived discrepancies between the accounts she gave to the court and to Shapera. "The test of cross-examination is the highest and most indispensable test known to the law for the discovery of truth." (Internal quotation marks omitted.) *State* v. *Ali*, 233 Conn. 403, 424, 660 A.2d 337 (1995). "[A]n important function of cross-examination is the exposure of a witness' motivation in testifying." (Internal quotation marks omitted.) *State* v. *Gould*, 241 Conn. 1, 16, 695 A.2d 1022 (1997). In assessing the credibility of Briere's allegations, the trial court properly considered whether perhaps her dissatisfaction with the verdict "led [her] into imagining sinister happenings which simply did not occur . . . ." *United States* v. *Moten*, 582 F.2d 654, 665 (2d Cir. 1978). The trial court's conclusion that Briere was not credible, without more, does not render the court biased and is no bar to conducting the necessary further inquiry on remand.

[1] Although race and ethnicity are not equivalent terms, I will use the terms "ethnic" and "racial" interchangeably, as does the majority, because I believe the majority's decision applies equally to both forms of bias.

inquire on the record regarding allegations of juror misconduct that come to light after a verdict has been returned. Id., 524. In *Brown*, we crafted a balancing test designed to take into account the many competing interests inherent in postverdict allegations of juror misconduct. We established a rule of general applicability that "a trial court must conduct a preliminary inquiry, on the record, whenever it is presented with any allegations of jury misconduct in a criminal case, regardless of whether an inquiry is requested by counsel." Id., 526. We were careful to note, however, that "the form and scope of such an inquiry lie within a trial court's discretion," and that "[w]hether a preliminary inquiry of counsel, or some other limited form of proceeding, will lead to further, more extensive, proceedings will depend on what is disclosed during the initial limited proceedings and on the exercise of the trial court's sound discretion with respect thereto." Id. In doing so, "[w]e recognize[d] that the trial judge has a superior opportunity to assess the proceedings over which he or she personally has presided . . . and thus is in a superior position to evaluate the credibility of allegations of jury misconduct, whatever their source. There may well be cases, therefore, in which a trial court will rightfully be persuaded, solely on the basis of the allegations before it and the preliminary inquiry of counsel on the record, that such allegations lack any merit." (Citations omitted.) Id., 527–28.

The appropriate test to be employed in analyzing the defendant's claim is, therefore, whether the trial court abused its discretion in concluding that the allegations of misconduct were not credible and declining to conduct further inquiry. Our decision in *Brown* to defer to the trial court's superior ability to assess the credibility of witnesses and the merits of allegations of misconduct reflects the long settled distinction between the unique roles of appellate and trial courts. " 'The factfinding

function is vested in the trial court with its unique opportunity to view the evidence presented in a totality of circumstances, i.e., including its observations of the demeanor and conduct of the witnesses and parties, which is not fully reflected in the cold, printed record which is available to us. Appellate review of a factual finding, therefore, is limited both as a practical matter and as a matter of the fundamental difference between the role of the trial court and an appellate court.'" *D'Ascanio* v. *D'Ascanio*, 237 Conn. 481, 487, 678 A.2d 469 (1996); *Season-All Industries, Inc.* v. *R. J. Grosso, Inc.*, 213 Conn. 486, 498, 569 A.2d 32 (1990). "In a case tried before a court, the trial judge is the *sole arbiter of the credibility of the witnesses* and the weight to be given specific testimony." (Emphasis added; internal quotation marks omitted.) *Season-All Industries, Inc.* v. *R. J. Grosso, Inc.*, supra, 498; *Castonguay* v. *Plourde*, 46 Conn. App. 251, 262, 699 A.2d 226, cert. denied, 243 Conn. 931, 701 A.2d 660 (1997).

On the rare occasions when we have felt the need to use our supervisory powers to infringe upon a trial court's traditional discretionary function, we have done so with great caution and only in extraordinary cases. See *State* v. *Jones*, 234 Conn. 324, 346, 662 A.2d 1199 (1995). In *Jones*, a capital felony case, the trial court denied the defendant's request to bifurcate his trial to allow the jury to determine first whether the defendant was guilty of murder before being informed that the defendant had previously been convicted of murder. In *Jones*, we recognized that the question of severance is clearly within the discretion of the trial court, but we also noted that the extraordinary nature of the case called for the exercise of our supervisory powers. We concluded that "[i]f this were an ordinary case, we would find no abuse of discretion by the trial court's rulings in this case. Because of the high risk of prejudice to the defendant on the present record and the absence

of any prejudice to the state, combined with the extraordinary care required in appellate scrutiny of a *capital felony* conviction, we conclude, however, that the risk that the defendant failed to receive a fair trial is so substantial that we will exercise our supervisory powers . . . ." (Emphasis added.) Id. Again, in *Brown* we recognized in reviewing discretionary decisions of the trial court that we have a "circumscribed role" in which "we have reserved the right to find an abuse of discretion in the *highly unusual case* in which such an abuse has occurred." (Emphasis added.) *State* v. *Brown*, supra, 235 Conn. 524. The present case, however, is not "highly unusual." In fact, it is quite similar to *Brown* and to *State* v. *Brye*, 236 Conn. 209, 671 A.2d 1295 (1996), in which we employed the abuse of discretion standard in our approval of the trial court's application of *Brown*.

It is unnecessary to extend a great deal of deference to the trial court in order to affirm its conclusion that June Briere, the repentant juror, was not credible and that the alleged juror misconduct never occurred. The record conveys the dubious reliability of her allegations. In her first communication to the court, a letter dated March 27, 1996, one month after the jury had reached its verdict, Briere indicated that she regretted her verdict and was biased in favor of the defendant.[2] She informed the court in her letter that she had had second thoughts about the defendant's guilt. She also sought leniency from the court on the defendant's behalf because the victim was a drug dealer and Willimantic was, in her estimation, better off without him. Additionally, she indicated that she had been and would continue to be intimately involved with and supportive of the defendant and his family. At that point, it was clear that

---

[2] See footnote 14 of the majority opinion for the text of Briere's letter.

she was hardly a trustworthy reporter of what allegedly had taken place in the jury room.[3]

Moreover, she never informed the court in her letter of any ethnic comments, even though the court, in its instructions, had cautioned the jury concerning the impropriety of ethnic considerations in its deliberations. More importantly, however, her allegations were inconsistent. The letter she sent to the court indicated only that she had had second thoughts about her verdict and wanted the court to be lenient in sentencing the defendant. She never indicated at that time that there had been any hint of ethnic bias in the jury's deliberations. After sending her letter, Briere spoke to the trial court's clerk and informed her that an unidentified juror had overheard a racist comment about the defendant from an unidentified person while the juror was at lunch. Briere never indicated to the clerk that she had heard racist comments from fellow jurors in the jury room.[4] Briere told the defendant's attorney a different story, however, indicating that a particular juror had made several racist comments in the jury room in an attempt to convince the other jurors to find the defendant guilty.

The inconsistencies between the allegations contained in Briere's letter and those made in her conversation with the clerk, together with the explanations she proffered to the trial court hardly compelled the trial court to afford her allegations any credence.[5] She first

[3] Briere's actions are analogous to those of the recanting witness in *Shields* v. *State*, 45 Conn. 266, 270 (1877), "to wit, after the fact self-doubt brought on by the realization that one's testimony has put another behind bars." *Johnson* v. *State*, 36 Conn. App. 59, 69, 647 A.2d 373 (1994). It is obvious from the record that Briere was having doubts about her role in the defendant's conviction.

[4] See footnote 15 of the majority opinion for the text of the clerk's notation regarding the conversation.

[5] See footnote 16 of the majority opinion for the text of the trial court's colloquy with Briere.

excused her failure to report the alleged juror miscon-
duct because of family pressure. When she wrote her
letter to the court, however, she failed to mention any
juror misconduct. Thereafter, when she talked to the
trial court's clerk, she related a rather vague and disori-
ented story in which her allegations of juror misconduct
were much less serious than those that she related to
the defendant's attorney. Moreover, she insisted that
her stories were not inconsistent, although on their face
they were grossly disparate. Under the circumstances,
I cannot argue with the trial court's conclusion[6] that
Briere's claims were not credible, particularly because
the trial court was there to observe her demeanor while
she was making those claims, and I was not. "[T]he
trial court's reasons for disbelieving [a witness] may
have been based, in part, on those myriad of tiny signals,
such as tone of voice, manner of breathing, gesticula-
tions, nervousness and the like that traditionally are
used by triers of fact in assessing a witness' credibility."
*Johnson* v. *State*, 36 Conn. App. 59, 72–73, 647 A.2d
373, cert. denied, 231 Conn. 946, 653 A.2d 827 (1994).

In addition to Briere's obvious bias in favor of the
defendant and her inconsistent accounting of the
alleged juror misconduct, which the trial court did not
credit, the court possessed other evidence that the
claimed juror misconduct did not occur. None of the
other eleven jurors, all of whom had been instructed
concerning the impropriety of racial considerations in
their deliberations, and all of whom had been advised
to inform the court of any improper jury conduct, saw fit
to tell the court that a juror had made racist comments
during deliberations.[7] Moreover, during voir dire, all of

___

[6] See footnote 19 of the majority opinion for the text of the trial court's
factual finding.

[7] The issue of racial and ethnic bias was at the forefront during the voir
dire in light of the fact that one venireperson made racist comments in the
jury assembly room and subsequently to the court. She was dismissed from
the jury pool. The defense attorney's voir dire and the trial court's admonition

the jurors were questioned concerning any possible ethnic bias, and the defense attorney and the court were both satisfied that none of the jurors were biased, including the juror alleged to have made the comments in issue.

Finally, the court recalled and questioned the jury foreperson, Paul Belanger. When Belanger was questioned concerning Briere's allegations, he informed the court that he did not believe that any racist comments had been made by any juror. He stated that if such comments had been made, it could only have been if " 'they said it low under their breath' "; otherwise, he would have been aware of the comments.[8] Briere had asserted, however, that the alleged racist comments had been made in a blatant attempt to convince the other jurors that they should convict the defendant because of his ethnicity. It would defy reason to conclude that forceful arguments in favor of conviction would have been made "under his breath" by the allegedly offending juror.

Acting on the basis of what I would consider to be ample evidence, the trial court concluded that the alleged ethnic slurs never were made. The court stated that Briere simply was not credible and was "acting out of deception or delusion," and that it was "thoroughly convinced that the allegations of misconduct never occurred . . . ."[9] As we acknowledged in *Brown*, "the trial judge has a superior opportunity to assess the proceedings . . . [and] to evaluate the credibility of allegations of jury misconduct, *whatever their source*." (Citations omitted; emphasis added.) *State* v. *Brown*,

to the jury strongly emphasized that racial bias had absolutely no place in the jury's deliberations.

[8] See part III of the majority opinion for a discussion of Belanger's testimony.

[9] See footnote 19 of the majority opinion for the text of the trial court's factual finding.

supra, 235 Conn. 527–28. I agree that juror misconduct stemming from racial or ethnic bias is more invidious and probably more destructive of the purposes of the trial process than other forms of juror misconduct. It does not follow, however, that a trial court is not qualified to identify factually unsupported allegations and witnesses lacking credibility when the allegations and credibility relate to racial bias as opposed to some other form of misconduct. That is what trial judges do. Consequently, I disagree with the majority's decision to invoke our supervisory powers to create a per se rule uniquely applicable to cases of alleged misconduct relating to racial or ethnic bias. By doing so, we are telling trial courts that, in response to allegations of racial or ethnic bias, no matter how outlandish or unbelievable, they must now conduct a structured investigation. I would think that if the source of the allegations is completely discredited by the trier of fact, continuing the investigation would be an exercise in futility.

A supervisory rule that mandates the form and scope of the inquiry in every case of alleged racial bias on the part of a juror is both unnecessary and ill-advised. The rule adopted in *Brown* is more than adequate to address allegations of racial bias. Racial bias is so detrimental to our system of justice that in many cases it will be an abuse of discretion if the trial court fails to conduct an inquiry of the jurors when such an allegation surfaces. It is not, however, a per se abuse of discretion in every case. A mandatory evidentiary hearing rule undermines the trial court's ability to dispense with allegations that are without merit and to assess those factors set forth in *Brown* in weighing the competing interests at stake. Id., 529–31.

Postconviction allegations of juror misconduct require the court to strike a delicate balance between the competing interests of the state and the defendant. Obviously, allegations of juror misconduct must be

taken seriously at any stage of the proceedings and inquiry is always warranted. Id., 531. "[A]fter a jury verdict has been accepted, [however] other state interests emerge that favor proceedings limited in form and scope." Id. Specifically, we have identified those compelling state interests to include preserving the "finality of judgments . . . and in protecting the privacy and integrity of jury deliberations, preventing juror harassment and maintaining public confidence in the jury system." (Citations omitted.) Id. Certainly, there are circumstances in which these state interests must give way to the countervailing interest of the defendant. A defendant's right to a fair trial, an interest shared by the state, is one such interest. Our rule set forth in *Brown,* however, adequately addressed this concern. In *Brown,* we concluded that "[t]he more obviously serious and credible the allegations, the more extensive an inquiry is required; frivolous or incredible allegations may be disposed of summarily." Id. An allegation of racial bias is perhaps the most serious of juror misconduct allegations. Pursuant to the rule adopted in *Brown,* the trial court always will be obliged to conduct an inquiry. Moreover, in light of the seriousness of the allegation, the court must err on the side of caution in the thoroughness of the inquiry. Once the allegation is found to be frivolous or incredible, however, there is no compelling reason to engage in a full evidentiary hearing.

In many cases alleging juror misconduct based on racial bias, it would be reasonable to conclude that the trial court abused its discretion if it failed to inquire of the accused juror or others who might have heard the alleged racist remarks. Every case is unique, however, and must be viewed individually. It is for this reason that, in *Brown,* we left the form and scope of the inquiry to the discretion of the trial court. In light of all of the evidence presented in this case, the trial court's inquiry

was adequate because the court found the source of the allegations unbelievable and thus did not abuse its discretion in halting the inquiry when it did. The majority opinion discounts any consideration of factors that weigh in favor of the state, and instead tips the balance wholly in favor of the defendant, irrespective of the unbelievability of the allegations or the harm that might result from an unnecessary recall of the jurors.

There is no doubt that when racism rears its ugly head, it must be dealt with swiftly and surely to avoid its invidious effect. It is equally true, however, that when allegations of racism are found to be false and unfounded after an inquiry, the trial court should deal with them forthwith, lest they dilute the significance of legitimate allegations. Moreover, the finality of judgments and the legitimate expectation of jurors that their deliberations will be private and that they will not unjustly be made to defend against baseless charges or have their integrity impugned, weigh in favor of not continuing the investigation when the source of the allegation is completely discredited by the trier of fact. To give credence to Briere's meritless allegations in this case by establishing a per se rule that arbitrarily mandates a full evidentiary inquiry into the most baseless of assertions demeans, rather than enhances, our notions of justice.

Finally, I disagree with the majority's conclusion that its new rule will create no greater burden on the trial courts than that imposed by *Brown*. Hereafter, whenever a defendant alleges that a juror was racist or that racist comments infected the jury, the court must recall the jurors, regardless of whether there is any believable basis for the allegation. When the allegations are baseless, as the trial court found them to be in this instance, this process will be a waste of the court's time and resources, will demean the court and the jurors, and will be destructive of the finality and integrity of jury

verdicts. Pursuant to *Brown*, the trial court at least had the ability to ascertain the basis for the allegations and to determine their validity before convening an evidentiary hearing. That is no longer the case. There is little doubt that defendants will now employ the tactic of floating accusations of racial bias to a variety of ends. They may do so out of spite to harass jurors, to elicit information regarding jury deliberations, or simply as a fishing expedition to search for and develop fodder for an appeal. Furthermore, this decision is likely to have the undesirable effect of prompting trial judges to engage in full evidentiary hearings for allegations of any manner of juror misconduct, not just those relating to racial bias, for fear that if such a hearing is not conducted, this court will once again revise its mandate in *Brown* relating to the form and scope of the necessary inquiry.

The application of our supervisory powers to create a per se rule mandating the form and scope of the trial court's inquiry in cases of racial bias allegations, I believe, is both unnecessary and ill-advised for the proper resolution of this case. The procedures adopted in *Brown* are more than adequate to address the issue of whether the trial court's inquiry in this case was adequate. I would conclude that the trial court did not abuse its discretion and would, therefore, affirm the trial court's judgment. I concur with parts I and II of the majority opinion and respectfully dissent with respect to part III.