# STATE OF CONNECTICUT *v.* MICHAEL CASTILLO
## (AC 31086)

DiPentima, Gruendel and Lavine, Js.*

technical or substantive because the claim is unreviewable due to the inadequate record.

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

Argued January 11—officially released June 15, 2010

*Robert E. Byron*, special public defender, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, *Dennis J. O'Connor*, supervisory assistant state's attorney, and *Robin D. Krawczyk*, senior assistant state's attorney, for the appellee (state).

*Opinion*

LAVINE, J. The defendant, Michael Castillo, appeals from the judgment of conviction, rendered after a jury trial, of one count of capital felony in violation of General Statutes §§ 53a-54b (7) and 53a-8, one count of capital felony in violation of General Statutes §§ 53a-54b (2) and 53a-8, three counts of murder in violation of General Statutes §§ 53a-54a (a) and 53a-8, and one

count of conspiracy to commit murder in violation of General Statutes §§ 53a-48 (a) and 53a-54a (a). On appeal, the defendant claims that the trial court (1) denied him his sixth amendment right to a trial by an impartial and informed jury by directing the jury to find him guilty and (2) abused its discretion with respect to the alleged misconduct of a juror. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. Shortly after 5 p.m. on July 30, 2003, Robert Stears, Barry Rossi and Lorne Stevens (victims) were found dead or dying at B & B Automotive, located at 436 Spring Street in Windsor Locks.[1] In an information filed August 7, 2007, the state charged that the defendant, acting with intent to cause the death of the victims, intentionally aided Jose Guzman, Erik Martinez and Benedetto Cipriani to murder the victims and that he did so for pecuniary gain. The state also charged the defendant in separate counts with the murder of each of the victims and in one count with conspiring with Guzman, Martinez and Cipriani to cause the murders of the victims.[2]

---

[1] Stears and Rossi owned B & B Automotive, a vehicle repair business. Sinsigalli Signs was located next to B & B Automotive. On July 17, 2003, Christopher Sinsigalli, the owner of Sinsigalli Signs, noticed a red Mitsubishi automobile bearing New York license plates parked in the parking lot of his business. The car was moved from one parking space in the lot to another several times. He recorded the license plate number of the vehicle. When he saw him, Sinsigalli spoke briefly with the operator of the vehicle, who said that he was interested in buying a sign. When Sinsigalli returned to his business, the operator drove off. Sinsigalli identified Benedetto Cipriani as the operator of the vehicle from a photographic array prepared by the Windsor Locks police.

[2] In its appellate brief, the state summarized the facts, stating that "[t]he defendant, with foreknowledge of what was to occur, drove . . . Guzman from Hartford to B & B Automotive in Windsor Locks, where Guzman executed [the victims] by shooting each one in the head. The defendant thereafter drove Guzman back to Hartford and later collected a $2000 fee for his assistance."

In 2003, Martinez lived with members of his family in an apartment at 12 Flatbush Avenue in Hartford. The residents of the apartment included Martinez' mother, Rose Emily Mendez; his girlfriend, Jennifer Cruz; and Guzman. Mendez made the acquaintance of Cipriani, who lived in Meriden, in an Internet chat room and occasionally went out with him. Martinez met Cipriani, who drove a maroon Mitsubishi, in May, 2003. Cipriani spoke with an accent and said that he worked in New York as a business executive.

In May, 2003, Cipriani took Mendez, Martinez and Cruz out for dinner. During the evening, Cipriani approached Martinez about doing something illegal in return for money. Cipriani told Martinez that he wanted Stears hurt and his business robbed.[3] Cipriani also told Martinez that Stears had raped the daughter of a friend and that he was racist against Puerto Ricans. Cipriani knew Martinez, a Puerto Rican, had been conceived by rape. Cipriani gave Martinez a piece of paper that contained the personal identification number for a telephone calling card.

Later Cipriani offered Martinez $7000 to murder Stears. Initially, Martinez agreed to commit the murder. Guzman was to participate by driving Martinez to B & B Automotive. Cipriani twice drove Martinez to B & B Automotive to orient him to the area. Cipriani telephoned Martinez approximately five times a week to discuss the murder. According to Martinez, Cipriani was holding money for his friend whose daughter was raped, and there was a deadline for committing the murder. Cipriani was not happy with the delay and told Martinez that he would have him "in Staten Island with the garbage."[4]

---

[3] Evidence was adduced at Cipriani's trial that he was having an affair with Stears' wife at the time of the murders.

[4] Martinez asked Cipriani what that meant; Cipriani told Martinez that he would be "dead, in a dump."

Martinez discussed the murder plan with Cruz and Guzman and decided he did not want to commit the murder. Guzman, however, was interested in committing the murder and met with Cipriani. Guzman informed Martinez that Cipriani had told him that if Martinez had to kill anyone else, to go ahead and do it; he would pay more. Cipriani thought that the murder should be committed at 5 p.m. because only Stears would be at B & B Automotive at that time. Martinez discussed the murder plan with the defendant, a cousin by marriage, explaining that Guzman had to "take somebody out" and needed a driver. Martinez, Guzman and the defendant discussed money. The defendant wanted $2000 to participate in the murder, a sum Guzman agreed to pay him.

Prior to July 30, 2003, Martinez purchased a nine millimeter handgun with $900 supplied by Cipriani. He bought the gun on Benton Street in Hartford from a man named Charlie. Martinez and Guzman test fired the gun late at night in Hyland and Goodwin Parks in Hartford.

Guzman told Martinez on July 30, 2003, that that day was the day he was going to carry out the murder. At approximately 4:30 p.m., Martinez saw Guzman leave the apartment and get into a Nissan Pathfinder vehicle being driven by the defendant. Cruz also was present when the defendant and Guzman met at the Flatbush Avenue apartment and saw the two men leave in the defendant's Pathfinder.

Shortly after 5 p.m. on July 30, 2003, Raymond LeClair, an employee of Town Fair Tire, arrived at B & B Automotive to deliver a tire. As he drove into the premises, he encountered a red pickup truck that had been abandoned as it was exiting the driveway.[5] The driver's door of the pickup was open. In order to get

---

[5] The red pickup truck was later identified as belonging to Stears.

around the pickup truck, LeClair had to close the door. When he did, the keys to the vehicle fell to the ground. LeClair drove to the building to make his delivery. Inside the building he saw a body on the floor and a "red glaze" near it. He got back in his truck to drive to the front of the building, where the office was located, with the intent of calling the police. At approximately the same time, Douglas Law and his wife, Patricia Law, drove their vehicles to the front of B & B Automotive where they intended to leave Patricia Law's vehicle for repair. When Douglas Law entered the building, he sensed that something was wrong. He heard moaning and saw two bodies on the floor. He ran from the building and called 911. An ambulance and six police cruisers arrived quickly. After the police officers secured the premises, the emergency medical personnel found the three victims. They all had been shot in the head at least once. Rossi and Stevens were dead. Stears was taken to Hartford Hospital where he died shortly thereafter.

After the defendant and Guzman left the Flatbush Avenue apartment, Martinez fell asleep watching television. When he awoke, Guzman and the defendant were present. According to Cruz, the defendant and Guzman returned to the apartment approximately one hour after they had left in the Pathfinder. She thought that the defendant was "amped up." The defendant excitedly told Martinez, "[y]o, we did it." The defendant then explained how he drove to B & B Automotive, "scoped the place out," left and returned and "stopped the car in the driveway." Guzman picked up the story at that point and described how he went to the driver's side of the truck, pulled out the gun, ordered the man to get out of the truck and walked him at gunpoint into B & B Automotive. Two other men were inside. Guzman ordered the victims to get on the floor. Guzman explained to Cruz and Martinez how he shot the victims.

Guzman then took the cordless land line telephone (land line) in the apartment and went out on the porch to call Cipriani.[6]

The defendant invited Cruz and Martinez to watch the television news if they did not believe him and Guzman that three people had been murdered. Cruz and the others were watching the 10 p.m. television news, which reported a story about the murders at B & B Automotive. The broadcast included a video of the red pickup truck in the driveway, which prompted Guzman to say, "[t]his is where we stopped 'em, right there."

Three days after the victims were killed, Martinez telephoned his uncle, Jose Velazquez, whom he asked to drive him and Guzman from the Flatbush Avenue apartment to a Stop and Shop supermarket in Wallingford.[7] When they arrived at the Stop and Shop, Cipriani was standing outside. Guzman and Cipriani went into the Stop and Shop. When Guzman returned to the car, he had a wad of money. He gave Martinez $1000, which Martinez believed was payment for purchasing the gun used to kill the victims and introducing Guzman to Cipriani. Guzman also gave Velazquez $200 for driving him to the Stop and Shop and for drugs. Guzman also gave Martinez $2000 to give to the defendant for being Guzman's driver.

The police made progress in their investigation in late 2003 when Velazquez was arrested on a unrelated matter. Velazquez asked to speak to the state police

---

[6] Later, Guzman put the gun he used to kill the victims on Martinez' bed. Martinez told him to "get it out of there," and Guzman put the gun under the back steps of the apartment. Two weeks later Martinez took the gun and sold it to someone for $250.

[7] Velazquez was busy at the time, and Martinez telephoned him three times before he arrived at the Flatbush Avenue apartment.

about the triple homicide in Windsor Locks.[8] The information Velazquez provided led the police to Guzman and Martinez.

Christopher Sinsigalli and Stears' widow, Shelley Stears, led police to Cipriani. See footnotes 1, 3 and 5 of this opinion. Police interviewed Cipriani at his home on July 31, 2007. On the basis of what they perceived to be falsehoods in Cipriani's statement, police executed warrants for telephone records. The telephone records they obtained produced evidence of communication between the conspirators. On July 30, 2003, the defendant had received calls from Martinez' land line at 11:06 a.m. and 11:54 a.m. At 1:29 p.m., the land line was used to place a call to one of Cipriani's cellular telephones. At 4:57 p.m., shortly before the murders, the defendant's cellular telephone received an incoming call that was relayed by a cellular tower located less than one mile from B & B Automotive. At 5:38 p.m., a call was made on one of the defendant's cellular telephones to one of Cipriani's cellular telephones. Another such call was placed at 6:57 p.m. On August 1, 2003, at 6:31 p.m., 6:44 p.m. and 7:06 p.m., three outgoing calls were made on the land line to Velazquez' cellular telephone. Later that day, at 9:18 p.m., the land line was used to place an outgoing call to the defendant's subscribed cellular telephone.

The jury found the defendant guilty of all charges. Following sentencing,[9] the defendant filed this appeal.

I

The defendant claims that the court denied him the constitutional right to an impartial and informed jury

---

[8] When Guzman returned to Velazquez' vehicle in the parking lot at the Stop and Shop, Velazquez asked Guzman why he had so much money. Guzman told him what he, Martinez and the defendant had done.

[9] The court sentenced the defendant to an effective term of life in prison plus twenty years.

by directing the jury to find him guilty. Specifically, the defendant claims that the court (1) intruded on the jury's authority by instructing that (a) "[i]f there is no reasonable doubt, then the accused must be found guilty" and (b) "our law provides that no conviction can be had without testimony from two witnesses or the equivalent thereof. And, in this case, where the state has called approximately twenty-five witnesses, you may well find that that burden has been met," and (2) erred by instructing that "[w]e call it capital felony, but the death penalty, as you know, I'm sure, is not in play— at issue in this case." We disagree, because the court's charge in its entirety was correct in law, adapted to the issues and adequate to guide the jury.

"The standard of review for claims of instructional impropriety is well established. [I]ndividual jury instructions *should not be judged in artificial isolation,* but must be viewed in the context of the overall charge. . . . The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . Thus, [t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper verdict . . . and *not critically dissected in a microscopic search for possible error.* . . . Accordingly, [i]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury. . . . In other words, we must consider whether the instructions [in totality] are sufficiently correct in law, adapted to the issues and ample for the guidance of the jury." (Citation omitted; emphasis added; internal quotation marks omitted.) *State* v. *Peeler,* 271 Conn. 338, 360–61, 857 A.2d 808 (2004), cert. denied, 546 U.S. 845, 126 S. Ct. 94, 163 L. Ed. 2d 110 (2005).

## A

The defendant has raised two claims that the court intruded on the jury's fact-finding province. We disagree.

### 1

The defendant claims that by instructing, "[i]f there is no reasonable doubt, then the accused must be found guilty," it directed the jury to find him guilty. The defendant takes particular exception to the court's use of the word must. The defendant did not preserve his claim at trial and asks us to reverse his conviction under *State v. Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). A defendant can prevail under the *Golding* doctrine "only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) Id. The defendant's claim is reviewable because the record is adequate for our review and the claim is of constitutional magnitude. See *State v. Schiappa*, 248 Conn. 132, 165–66, 728 A.2d 466 (discussing instructional claims amenable to *Golding* review), cert. denied, 528 U.S. 862, 120 S. Ct. 152, 145 L. Ed. 2d 129 (1999). The defendant cannot prevail, however, because the alleged constitutional violation clearly did not exist and the defendant clearly was not deprived of a fair trial.[10]

---

[10] The defendant also sought review under the plain error doctrine. See Practice Book § 60-5. We decline to afford the claim plain error review because the issue presented is not one of those truly extraordinary situations the doctrine is intended to remedy. See *State v. Gamble*, 119 Conn. App. 287, 292 n.2, 987 A.2d 1049, cert. denied, 295 Conn. 915, 990 A.2d 867 (2010).

The language with which the defendant takes issue was taken from that portion of the court's charge concerning reasonable doubt. The court charged the jury in part as follows: "Now, of course, absolute certainty in the affairs of life is almost never attainable, and the law does not require absolute certainty on the part of the jury before you return a verdict of guilty. The state does not have to prove guilt beyond all doubt or to a mathematical or absolute certainty. What the law does require, however, is that, after hearing all the evidence, if there is something in that evidence or lack of evidence which leaves in the minds of the jury, as reasonable men and women, a reasonable doubt about the guilt of the accused, then the accused must be given the benefit of that doubt and acquitted. If there is no reasonable doubt, then the accused must be found guilty.

"Proof beyond a reasonable doubt is proof which precludes every reasonable hypothesis except guilt, is consistent with guilt, and is inconsistent with any other reasonable conclusion. If you can, in reason, reconcile all of the facts proved with any reasonable theory consistent with the innocence of the accused, then you cannot find him guilty."

The instruction challenged by the defendant has been challenged previously in both this court and our Supreme Court and has been found to pass constitutional muster. In *State* v. *Santiago*, 17 Conn. App. 273, 276, 552 A.2d 438 (1989), the defendant was charged with the crime of possession of narcotics with intent to sell. The court there charged the jury in part: "If you find the state has proven, beyond a reasonable doubt, each one and all the elements of this offense . . . you must find the defendant guilty." (Internal quotation marks omitted.) Id., 279. The defendant in that case claimed that the trial court's use of the word must was "the equivalent of a directed verdict of guilty." Id. In rejecting that defendant's claim, this court explained:

"A directed verdict results when a court instructs the jury to find the defendant guilty of a particular charge. The use of the word must is not tantamount to a directed verdict. It is not even a functional equivalent. . . .

"The use of the word must in such an instruction has passed scrutiny in our Supreme Court. See *State* v. *Storlazzi*, 191 Conn. 453, 466 n.9, 464 A.2d 829 (1983); *Crawford* v. *Warden*, 189 Conn. 374, 382 n.2, 456 A.2d 312 (1983). While the court did not consider this exact issue, it did hold that [t]he instructions, read in their entirety, did not direct or advise the jury how to decide the matter . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Santiago*, supra, 17 Conn. App. 279–80; see also *State* v. *Colon*, 272 Conn. 106, 232 n.83, 234, 864 A.2d 666 (2004) (reasonable doubt charge in entirety not improper), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005); *State* v. *Montgomery*, 254 Conn. 694, 729 n.39, 730, 759 A.2d 995 (2000) (same); *State* v. *McCarthy*, 105 Conn. App. 596, 626–28, 939 A.2d 1195 (same), cert. denied, 286 Conn. 913, 944 A.2d 983 (2008).[11] The defendant has failed to address any of those authorities in his appellate brief or to consider that the instruction is included in D. Borden & L. Orland, 5 Connecticut Practice Series: Criminal Jury Instructions (4th Ed. 2007) § 2.10, pp. 110–11 ("[i]f, based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you must find him guilty").

The challenged reasonable doubt instruction was but one sentence in the court's lengthy charge that included general instructions on the function of the jury, burden of proof, the elements of the crime, the requirement that the state prove each and every element of the

[11] The challenges to the jury instructions on reasonable doubt in each of those authorities used the language at issue in this appeal, but the language challenged here was not at issue in those prior cases.

crimes charged beyond a reasonable doubt and the requirement that the jury is the sole finder of facts, among other things. We conclude that the court's instruction did not invade the fact-finding province of the jury and direct the jury to find the defendant guilty.

2

The defendant also claims that the court directed the jury to a verdict of guilty by charging in part that "[w]ith respect to the crime of capital felony, our law provides that no conviction can be had without testimony from two witnesses or the equivalent thereof. And, in this case, where the state has called approximately twenty-five witnesses, you may well find that that burden has been met. But that, like all factual decisions, is for you to determine." We do not agree.

Again, in reviewing the defendant's claim, we consider it in the context of the court's charge. The court instructed the jury in part: "Let me talk [to] you about credibility, believability. You've observed the witnesses. The credibility, the believability, of those witnesses and the weight to be given to their testimony are matters entirely within your hands. It's for you alone to determine their credibility. Whether or not you find a fact proven is not to be determined by the number of witnesses testifying for or against it. It's the quality, not the quantity, of the testimony which should be controlling. Nor is it necessarily so that, because a witness testifies to a fact and no one contradicts it, you're bound to accept that fact as true. The credibility of the witness and the truth of the fact is for you to determine. Bear in mind that, except for the charges of capital felony, one witness' testimony is sufficient to convict, if it establishes all of the elements of a crime beyond a reasonable doubt.

"With respect to the crime of capital felony, our law provides that no conviction can be had without testimony from two witnesses or the equivalent thereof.

And, in this case, where the state has called approximately twenty-five witnesses, you may well find that that burden has been met. But that, like all factual decisions, is for you to determine."[12] The defendant's claim concerns the two witness rule of General Statutes § 54-83.

The defendant failed to take an exception to the court's charge with regard to the two witness rule and seeks to reverse his conviction pursuant to *Golding*. The defendant's claim is not of constitutional magnitude and therefore is not entitled to review. Section 54-83 provides that "[n]o person may be convicted of any crime punishable by death without the testimony of at least two witnesses, or that which is equivalent thereto."[13] In *State* v. *Ross*, 230 Conn. 183, 219, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995), our Supreme Court recognized that "§ 54-83 is a statutory enactment that prescribes the nature of the evidence that the state must adduce to prove its case. Unlike the reasonable doubt rule; *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970) (due process requires proof beyond reasonable doubt in criminal cases); *Summerville* v. *Warden*, 229 Conn. 397, 422–23, 641 A.2d 1356 (1994) (same); the evidentiary burden imposed by § 54-83 is not constitutionally compelled. See *State* v. *Ross*, supra, 219 (two witness rule is a statutory mandate)." (Internal quotation marks omitted.) *State* v. *Day*, 233 Conn. 813, 848, 661 A.2d 539 (1995), overruled in part on other grounds by *State* v. *Connor*, 292 Conn. 483, 528 n.29, 973 A.2d 627 (2009).[14]

---

[12] The court immediately thereafter instructed the jury on police testimony.

[13] General Statutes § 53a-35a provides in relevant part: "[T]he sentence of imprisonment shall be a definite sentence and the term shall be fixed by the court as follows: (1) For a capital felony, a term of life imprisonment without the possibility of release unless a sentence of death is imposed in accordance with section 53a-46a . . . ."

[14] The reviewability of the defendant's claim notwithstanding, we note that a similar charge was given by the trial court in *State* v. *Ortiz*, 252 Conn.

## B

The defendant's third instructional claim is that the court improperly informed the jury that the death penalty was not an issue in the case.[15] We do not agree.

Again we set forth the context in which the challenged instruction was presented to the jury. Initially, in its general instructions, the court stated in part: "Do not be concerned in any way with punishment to be imposed in this case in the event of conviction. That is a matter exclusively within the province of the court, under the limitations and restrictions imposed by statute. You are to find the fact of guilt or innocence of [the defendant] uninfluenced by the probable punishment or consequences which would follow a conviction."

Later, when the court was instructing the jury on the elements of the various crimes with which the defendant was charged, the court stated in part: "Now, that brings us to the two counts of capital felony. And since we're talking about vicarious liability . . . because if the—we have a capital felony statute that provides that anyone who commits the crime of murder—murders two or more people at the same time or in the course of the same transaction, is guilty of capital felony. We call it capital felony, but the death penalty, as you know, I'm sure, is not in play—at issue in this case."

The defendant bases his argument on the rule that "when a jury has no sentencing function, it should be admonished to reach its verdict without regard to what sentence may be imposed." (Internal quotation marks

533, 578, 747 A.2d 487 (2000) (state called approximately forty witnesses). Although the claim raised here was not at issue in *Ortiz*, our Supreme Court in *Ortiz* quoted similar instructional language without negative comment.

[15] The defendant did not preserve this claim at trial and seeks reversal of his conviction pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40. We review the claim because the record is adequate for review and the claim is of constitutional magnitude.

omitted.) *Shannon* v. *United States*, 512 U.S. 573, 579, 114 S. Ct. 2419, 129 L. Ed. 2d 459 (1994). We understand the defendant's claim to be that although the court told the jury that the defendant was not subject to the death penalty if he was found guilty, the court improperly failed to tell the jury that if it found the twenty-two year old defendant guilty, he faced life in prison. As such, the defendant argues the instruction underplayed the gravity of their deliberations and was not balanced.

In its appellate brief, the state properly points out that the mere name of the crime, capital felony, implies the death penalty. Rather than present the jury with an unbalanced view of the consequences of its verdict, the court's instruction served to make clear that the death penalty was not a possible consequence of conviction of capital felony, without violating the rule that the jury is to return its verdict without concern for the sentence that may be imposed.

In the case of *State* v. *Rizzo*, 266 Conn. 171, 833 A.2d 363 (2003) (en banc), our Supreme Court considered the appropriate burden of persuasion on the weighing process in our capital sentencing scheme. Id., 224. In its analysis, our Supreme Court reasoned that "[d]eath is different. The penalty of death differs from all other forms of criminal punishment, not in degree but in kind. It is unique in its total irrevocability." (Internal quotation marks omitted.) Id., 226. "[B]ecause of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." (Internal quotation marks omitted.) Id., 226–27.

The issue of the death penalty is debated by society. See *State* v. *Sostre*, 261 Conn. 111, 130–38, 802 A.2d 754 (2002). The court's instruction served to make the issue a nullity in this case. In doing so, the court did not violate the defendant's constitutional rights or his right

to a fair trial. The instruction had the benefit of permitting the jury to consider the evidence related to the capital offense alone, without the shadow of the greater societal concern regarding the death penalty. Compare *State* v. *Griffin*, 251 Conn. 671, 683, 741 A.2d 913 (1999) ("questioning venirepersons, prior to the guilt phase of the trial, about their beliefs regarding the death penalty, and excusing for cause those venirepersons whose opposition to the death penalty would interfere with the performance of their duties as jurors at the sentencing phase of the trial" does not infringe on right to impartial jury); see id., 683–709. The court should not be faulted for anticipating an issue likely to be in the minds of the jury and for clarifying the law relating to that issue. For these reasons, the defendant's claim that the court's instruction deprived him of an informed and impartial jury fails.

## II

The defendant's second claim is that the court abused its discretion by failing to conduct an adequate investigation into allegations of juror misconduct.[16] More specifically, the defendant claims that the court's inquiry was inadequate because the claim of juror misconduct concerned racial bias and communication between a juror and a member of a victim's family. We conclude, given the factual circumstances of this case, that the court's investigation was adequate pursuant to *State* v. *Brown*, 235 Conn. 502, 526, 668 A.2d 1288 (1995) (en

---

[16] In his appellate brief, the defendant asked this court to reverse his conviction on the basis of the alleged juror misconduct. During oral argument, the defendant agreed with the state's position that the defendant's remedy is a remand to the trial court to conduct a further inquiry. We agree with the state that should a defendant prevail on such a claim of juror misconduct on appeal, the remedy is to remand the case to the trial court for further proceedings according to law. See, e.g., *State* v. *Roman*, 262 Conn. 718, 729, 817 A.2d 100 (2003).

banc), and *State* v. *Santiago*, 245 Conn. 301, 323–40, 715 A.2d 1 (1998).[17]

The following facts are relevant to the defendant's claim. On October 9, 2007, the jurors heard the closing arguments of counsel followed by the court's instructions. At midday, the court interrupted its charge for the luncheon recess. When court reconvened, the following exchange took place between the court and counsel.

"The Court: Before we bring the jury in, there was a report from the victim advocate that one of our jurors apparently had a dead . . . battery . . . . And approached one of the victims' widows to ask if she had a jumper cable. And the widow just froze and said nothing. Presumably, the juror walked away. I believe she's in the courtroom.

"[Victims' Advocate]: Yes, Your Honor.

"The Court: And . . . she is able to point out the juror. So, if anybody wants to do that, we can. But it sounds like no contact. No harm, no foul. And no

[17] The state argues that the claim is not reviewable because the defendant waived any right to raise the claim on appeal when his counsel informed the court that no investigation beyond that which occurred on the record was necessary. Although the record indicates that defense counsel told the court that no additional inquiry was necessary, we decide the matter on the merits of the defendant's claim to make clear the scope of the inquiry that falls within a court's discretion in the face of alleged juror misconduct. See *State* v. *Waz*, 240 Conn. 365, 371 n.11, 692 A.2d 1217 (1997) (in interest of justice, appellate court may exercise supervisory power to review unpreserved claim).

We agree with the state, however, that ordinarily appellate review is not available to a party who follows one strategic path at trial and another on appeal, when the original strategy does not produce the desired result. See *State* v. *Beaulieu*, 118 Conn. App. 1, 9, 982 A.2d 245, cert. denied, 294 Conn. 921, 984 A.2d 68 (2009). "To allow the [defendant] to seek reversal now that his trial strategy has failed would amount to allowing him to induce potentially harmful error, and then ambush the state [and the court] with that claim on appeal." (Internal quotation marks omitted.) *State* v. *Foster*, 293 Conn. 327, 339, 977 A.2d 199 (2009).

knowledge of the identity of the person. So, the state request anything further?

"[The Prosecutor]: No, sir.

"The Court: Defense request anything further?

"[Defense Counsel]: *No, Your Honor.*

"The Court: Very well. Jury, please." (Emphasis added.)

At sentencing on January 11, 2008, however, when the defendant addressed the court, he stated in part: "Today, I bring to the court's attention something I brought to my lawyer's attention before the verdict, which was a violation of trial procedure. It is easy to play the blame game and attack people. This solves nothing, only shows you can belittle someone. *No, I don't think this mishap occurred on purpose.* A juror, who I later found out was the foreman of the jury, had contact with a family member of one of the victims . . . . She was not only a family member, she was the widow of the victim. They had contact outside the respective presence of court officials, as well as outside the compounds of the court.

"*I don't feel at this time attacking the juror or family member will—and putting them through any questioning will make a difference. I would like to spare them of this ordeal as it would be animosity and embarrassment, which would be unnecessary.* However, may I remind the court that any conversation held by a person of direct interest to this case with a juror could very well sway the entire jury, therefore hindering the fundamental backbone of a trial by jury system?

\* \* \*

"Again, *I stress the encounter seemed innocent enough,* but because we cannot with 100 percent assurity detail the contents of this conversation in question,

comments, questions or suggestions could have been made which may have swayed the view of this one juror. One must keep in mind, this was the foreman of the jury, from which, I was informed, the leader of the group who guides the rest of the jurors in a nonbiased matter so that they can weigh and judge the person sitting in the defendant's box. And, yet this juror, after the incident was brought to light, was allowed to continue his duty, and the juror had thoughts in the head that were planted in [this] head of the jury by an outside source.

\* \* \*

"It is a result of this event, *I am respectively approaching the court to declare a mistrial.* I will assume the court did not become aware of the full scope of this issue until today." (Emphasis added.)

The court did not recall the events underlying the defendant's request for a mistrial and addressed both counsel: "I have an unsupported allegation of juror misconduct. I have no motion. I have an obligation, as I understand the case law, to now conduct an inquiry to see if I need to go further. You wish to be heard?"

While counsel were conferring with one another, the court addressed the defendant, informing him that it was too late to move for a mistrial. The defendant then stated that he had brought the matter of juror misconduct to the attention of his counsel during trial. Thereafter, defense counsel addressed the court, stating, "I believe that this is not a new allegation,"[18] and described the events that transpired during the luncheon recess, which refreshed the court's memory. The court then

---

[18] Defense counsel John T. Walkley stated: "And that was addressed. And it's—to my knowledge, that it's the same event. So, obviously, I did talk to [the defendant], we both did at that time, and we obviously addressed that issue. And whether it was a problem, you know, we explored it, and a record was made of that."

noted that the inquiry at the time was on the record. Defense counsel offered nothing further but noted that the defendant again wanted to address the court.[19] The court permitted the defendant to address it.

The defendant failed to raise his claims at trial and seeks to prevail under *State* v. *Golding*, supra, 213 Conn. 239–40. We will review the defendant's claims because they are of constitutional magnitude. "Our jurisprudence on the issue of the right to an impartial jury is well settled. Jury impartiality is a core requirement of the right to trial by jury guaranteed by the constitution of Connecticut, article first, § 8, and by the sixth amendment to the United States constitution. . . . [T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors." (Internal quotation marks omitted.) *State* v. *Roman*, 262 Conn. 718, 725, 817 A.2d 100 (2003). The defendant cannot prevail, however, because he was not clearly deprived of a constitutional right and he clearly was not deprived of a fair trial.

"We have limited our role, on appeal, to a consideration of whether the trial court's review of alleged jury misconduct can fairly be characterized as an abuse of its discretion. . . . Even with this circumscribed role, we have reserved the right to find an abuse of discretion in the highly unusual case in which such an abuse has occurred. . . . The trial judge's discretion, which is a legal discretion, should be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice." (Internal quotation marks omitted.) *State* v. *Phillips*, 102 Conn. App. 716, 722, 927 A.2d 931, cert. denied, 284 Conn. 923, 933 A.2d 727 (2007).

---

[19] Defense counsel stated: "I think [the defendant] wants to put more on the record, Your Honor. That I'd rather have him put it on the record than through me."

Our Supreme Court has held that "a trial court must conduct a preliminary inquiry, on the record, whenever it is presented with any allegations of jury misconduct in a criminal case, regardless of whether an inquiry is requested by counsel. Although the form and scope of such an inquiry lie within a trial court's discretion, the court must conduct some type of inquiry in response to allegations of jury misconduct. That form and scope may vary from a preliminary inquiry of counsel, at one end of the spectrum, to a full evidentiary hearing at the other end of the spectrum, and, of course, all points in between. Whether a preliminary inquiry of counsel, or some other limited form of proceeding, will lead to further, more extensive, proceedings will depend on what is disclosed during the initial limited proceedings and on the exercise of the trial court's sound discretion with respect thereto." *State* v. *Brown*, supra, 235 Conn. 526.

## A

The defendant first claims that the court's inquiry was inadequate because the alleged juror misconduct concerned racial bias, and, therefore, the court was required to conduct an inquiry pursuant to *State* v. *Santiago*, supra, 245 Conn. 323–40. We disagree, as there was no suggestion of racial bias when the matter was presented to the trial court, and the defendant has failed to provide a factual predicate for his claim in this court that would require a remand for further inquiry.

In raising the claim on appeal, the defendant relies heavily on the cases of *State* v. *Phillips*, supra, 102 Conn. App. 716, and *State* v. *Santiago*, supra, 245 Conn. 301. Indeed, *Santiago* instructed that "[a]llegations of racial bias on the part of a juror are fundamentally different from other types of juror misconduct because such conduct is, ipso facto, prejudicial . . . ." *State* v. *Santiago*, supra, 336. The defendant's argument here

is that in the face of racial bias, the court had no discretion with respect to the type of inquiry it must conduct. As the defendant states in his appellate brief, the inquiry by the court must include, "at a minimum, an extensive inquiry of the person reporting the conduct, to include the context of the remarks, an interview with any persons likely to have been a witness to the alleged conduct, and the juror alleged to have made the [biased] remarks." (Internal quotation marks omitted.) *State* v. *Phillips*, supra, 724. Although we are bound by the legal principles on which *Phillips* and *Santiago* were decided, those cases are factually distinguishable from the case at hand, and the court was not required to conduct a more in-depth inquiry mandated by allegations of racial bias. "[A]ny assessment of the form and scope of the inquiry that a trial court must undertake when it is presented with allegations of jury misconduct will necessarily be fact specific." (Internal quotation marks omitted.) *State* v. *Santiago*, supra, 331.

In *Santiago* and in *Phillips*, the defendants claimed racial bias by word or deed on the part of a juror. In *Santiago*, a member of the jury postverdict communicated to defense counsel and the clerk of the court that one of the other jurors had used the term "spic" in reference to the defendant, who was Hispanic. Id., 323–26. The court later examined that juror and the jury foreperson.[20] In *Phillips*, the defendant filed an amended motion for an evidentiary hearing in which

[20] Our Supreme Court concluded that the court's inquiry was inadequate. *State* v. *Santiago*, supra, 245 Conn. 332. It instructed that "the trial court should consider the following factors in exercising its discretion as to the form and scope of a preliminary inquiry into allegations of jury misconduct: (1) the criminal defendant's substantial interest in his constitutional right to a trial before an impartial jury; (2) the risk of deprivation of the defendant's constitutional right to a trial before an impartial jury, which will vary with the seriousness and the credibility of the allegations of jury misconduct; and (3) the state's interests of, inter alia, jury impartiality, protecting jurors' privacy and maintaining public confidence in the jury system." Id., 331.

he alleged racial bias on the part of one of the jurors. *State* v. *Phillips*, supra, 102 Conn. App. 720. The court there "conducted an extensive inquiry of the juror reporting the conduct, of the juror alleged to have made racist remarks and also of the four other jury members who would have witnessed the alleged conduct." Id.[21]

In the present case, the information brought to the court's attention concerned a parking lot encounter between a member of the jury and the widow of one of the victims. The victim advocate reported the incident and that the widow "froze and said nothing." When the court learned of this encounter, it informed counsel and put the matter on the record. The court determined that the widow was in the courtroom and able to identify the juror. The court used a sports analogy, no harm, no foul, which we construe to mean that the juror and the widow did not discuss the case, and, therefore, there was no prejudice to the defendant. The court, however, asked the prosecutor and defense counsel if it should conduct a further inquiry. Defense counsel replied, "[n]o, Your Honor."

In addressing the court prior to sentencing, the defendant, who identifies himself as being of Puerto Rican heritage, sought a mistrial. He did not suggest that the encounter between the juror and one of the widows was tainted by racial bias. He stated that he did not want the court to embarrass the juror or the victim's widow by conducting a hearing and asked the court to declare a mistrial. He presented no factual basis to suggest racial bias. He merely insinuated that an

[21] This court determined that the trial court interviewed the entire jury but that it "should have restricted its inquiry of the jury to a solicitation of objective facts relating to the allegations, including statements heard and conduct observed, and should not have inquired into the effect of those facts on each juror's deliberations. The court should then have made an independent determination as to whether the evidence before it revealed racial bias on the part of a juror." *State* v. *Phillips*, supra, 102 Conn. App. 729.

improper conversation had taken place between the juror and the widow, which planted an improper motive in the mind of the juror. Even in his brief on appeal, the defendant has not presented any factual basis that racial bias tainted the jury in this case. We note that a defendant need not demonstrate that he was prejudiced by racial bias on the part of the jury; *State* v. *Phillips*, supra, 102 Conn. App. 718; but there must be some factual allegation to inform the court that racial bias is, in fact, at issue.

The alleged juror misconduct in this case does not contain a racial or ethnic basis, which sets it apart from *Santiago* and *Phillips*. The juror asked the widow of one of the victims in a parking lot whether she had jumper cables to deal with a dead battery. The irksome problem of a dead battery and the need for jumper cables are encountered by the driving public in general, without regard to race or ethnicity. We therefore conclude that there is no factual basis to suggest that the scope of the court's inquiry was inadequate because it did not comport with the type of inquiry required in the face of an allegation of racial bias on the part of a juror. Compare *State* v. *Johnson*, 288 Conn. 236, 269, 951 A.2d 1257 (2008) (nothing in record suggests racial bias on part of any juror).

B

The defendant's second claim is that the court abused its discretion by failing to make a meaningful inquiry into the juror misconduct that allegedly occurred when a member of the jury asked the widow of one of the victims if she had jumper cables.[22] We disagree.

With respect to this claim, the defendant relies on *State* v. *Roman*, supra, 262 Conn. 718. In that case, "the trial court failed to make any meaningful inquiry into a

---

[22] This claim is not based on an allegation of racial bias.

specific and facially credible claim of juror misconduct, namely, that a juror had spoken to a member of the victim's family." Id., 727. Our Supreme Court remanded the case for the trial court to conduct an inquiry. Id., 729.

"To ensure that the jury will decide the case free from external influences that might interfere with the exercise of deliberate and unbiased judgment . . . *a trial court is required to conduct a preliminary inquiry, on the record, whenever it is presented with information tending to indicate the possibility of juror misconduct or partiality.*" (Emphasis in original; internal quotation marks omitted.) Id., 726. Our Supreme Court has determined that "[a]lthough the form and scope of such an inquiry lie within a trial court's discretion, *the court must conduct some type of inquiry in response to allegations of jur[or] misconduct.* That form and scope may vary from a preliminary inquiry of counsel, at one end of the spectrum, to a full evidentiary hearing at the other end of the spectrum, and, of course, all points in between. Whether a preliminary inquiry of counsel, or some other limited form of proceeding, will lead to further, more extensive . . . proceedings will depend on what is disclosed during the initial limited proceedings and on the exercise of the trial court's sound discretion with respect thereto." (Emphasis in original; internal quotation marks omitted.) Id., 726–27.

The facts before us and those in *Roman* are distinguishable in that the court here conducted a preliminary inquiry on the record, which is in keeping with the directives of our Supreme Court. The representation of the victims' advocate was that a victim's widow was approached by a juror who asked if she had jumper cables. The widow "froze and said nothing." There was no indication that a further conversation took place. The court concluded that no harm had occurred but determined that the widow was available for further

inquiry and asked counsel if further inquiry were necessary. The defendant's counsel declined a further inquiry. The court concluded that no further inquiry was needed, and we cannot conclude that the court abused its discretion by failing to pursue this matter further.

The judgment is affirmed.

In this opinion the other judges concurred.

---

* The listing of judges reflects their seniority status on this court as of the date of oral argument.